**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 18, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARALEX RESOURCES, INC., a
Colorado corporation; ALEXIS M.
O'HARE; MARY C. O'HARE,

      Plaintiffs - Appellants,

v.

DAVID BARNHARDT, in his official
capacity as Acting Secretary of the United
States Department of the Interior; THE
UNITED STATES DEPARTMENT OF
INTERIOR; THE UNITED STATES OF
AMERICA,*

      Defendants - Appellees.

No. 17-1421

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CV-01893-CMA)**
_____

William E. Zimsky, Abadie & Schill, PC, Durango, Colorado, appearing for the
Appellants.

Tamara N. Rountree, Attorney, Environmental and Natural Resources Division, United
States Department of Justice, Washington, DC (Jeffrey H. Wood, Acting Assistant
Attorney General, and Eric Grant, Deputy Assistant Attorney General, United States
Department of Justice, Washington, DC; William Lazarus and John L. Smeltzer,
Attorneys, Environmental and Natural Resources Division, United States Department of
Justice, Washington, DC; and Philip C. Lowe, Rocky Mountain Regional Solicitor's

---

     * In accordance with Fed. R. App. P. 43(c)(2), David Barnhardt is substituted
for Ryan Zinke, as the respondent in this action.

Office, Department of the Interior, Lakewood, Colorado, with her on the brief), appearing for the Appellee.

_____

Before **BRISCOE**, **LUCERO**, and **MATHESON**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

Plaintiffs Maralex Resources, Inc. (Maralex), Alexis O'Hare and Mary C. O'Hare (the O'Hares) filed this action against the Secretary of the Department of the Interior (Secretary), the Department of the Interior, and the United States seeking review of a decision of the Interior Board of Land Appeals (IBLA) upholding four Notices of Incidents of Noncompliance that were issued by the Bureau of Land Management's (BLM's) Tres Rios Field Office to Maralex for failing to allow a BLM representative to access certain oil and gas lease sites operated by Maralex on land owned by the O'Hares. The district court affirmed the IBLA's decision. Plaintiffs now appeal.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude that the BLM, in issuing the Notices of Incidents of Noncompliance, lacked authority to require plaintiffs to provide BLM with a key to a lease site on privately-owned land or to allow the BLM to install its own locks on the gates to such lease site. Consequently, we reverse and remand to the district court with instructions to enter judgment in favor of plaintiffs on this "key or lock" issue.

2

I

*The Parcel and its component Tracts*

At issue in this case is a 320-acre parcel of land (the Parcel) that is located in the S1/2 of Section 35, Township 34 South, Range 7 West in La Plata County in southwestern Colorado. The Parcel, which is comprised of 240 acres of private surface/mineral estate and 80 acres of Indian surface/mineral estate, lies over the Ignacio Blanco gas field and the Fruitland coal formation.

The O'Hares own the surface and mineral estate in a 120-acre tract of land in the SW1/4SE1/4 and E1/2SW1/4 of the Parcel (the O'Hare Tract). The Southern Ute Indian Tribe (Tribe) holds the surface and mineral estate in the W1/2SW1/4 of the Parcel (the Tribe Tract). The remainder of the Parcel (the Remainder Tract)—the N1/2SE1/4 and SE1/4SE1/4—is privately-owned by the O'Hare family, J. Elmer and Wanda Lee Kenner, and Irma Rowse.

*The leases of the Tracts*

On June 6, 1974, the Tribe, acting pursuant to the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a-396g (2012), issued to Sun Oil Company an Indian oil and gas lease, Mining Lease Contract No. MOO-C-1420-1531, for its mineral estate in the Tribe Tract. Amoco Production Company (Amoco) later took over as the lessee.

On April 28, 1995, the O'Hares issued to Maralex[1] a private oil and gas lease for the O'Hare Tract. SG Interests III, Ltd. (SG III) later joined Maralex as co-lessee.

The O'Hares, Kenners, and Rowse issued three private oil and gas leases covering the Remainder Tract. SG III and Maralex became the lessees of those leases.

*The Communitization Agreement*

In 1996, all of the parties (SG III, Maralex, the Tribe, the O'Hares, Kenners, and Rowe) "communitized" their coal and gas interests in the Parcel under the terms of a written agreement. More specifically, in a written Communitization Agreement (CA) dated May 1, 1996, the parties agreed to develop and operate the Parcel "as an entirety, with the understanding and agreement . . . that all Communitized Substances produced therefrom [would] be allocated among the leaseholds comprising said area in the proportion that the acreage interest of each leasehold bears to the entire acreage interest committed to [the CA]." Aplt. App. at 3. The CA further stated, in pertinent part, that "[t]he royalties payable on Communitized Substances allocated to the individual leases comprising the [Tract] . . . shall be determined and paid on the basis prescribed in each of the individual leases." Id.

Two other provisions of the CA are relevant to this case. First, the CA stated: "This agreement shall be subject to all applicable Federal and State laws or executive

_____

[1] According to the record on appeal, Mary O'Hare is the president of Maralex. Aplt. App. at 8.

4

orders, rules and regulations . . . ." Id. at 4. In addition, the CA stated: "It is agreed between the Parties Hereto that the Secretary of the Interior, or his duly Authorized Officer, shall have the right of supervision over all operations within the Communitized Area to the extent same includes the oil and gas lease(s) under which the . . . Tribe is lessor and insofar as governed by applicable oil and gas regulations of the Department of Interior." Id. at 5.

The CA was approved by the Tribe and the Bureau of Indian Affairs (BIA) effective May 1, 1996.

*The wells operating under the CA*

There are four wells associated with the CA and arising from the underlying leases, all of which are operated by Maralex. The four wells are physically situated in two areas on the O'Hares' private surface estate in the O'Hare Tract. Each such area is enclosed by a fence and a locked gate. All four of the wells are producing "both fee and Tribal minerals" from the Fruitland coal formation. Id. at 32. Although the oil and gas at issue is produced from private mineral interests and from wells situated on private surface estates, such production is, under the terms of the CA, allocated to all of the oil and gas interests, including that of the Tribe, as the owner of record title to the mineral estate in the Tribe's Section of the Parcel.

*BLM's attempt to inspect the wells*

On February 11, 2013, Gabriel Trujillo, a Petroleum Engineering Technician employed by the BLM, sent an email to Maralex stating that he planned to inspect the four wells. On February 12, 2013, Christi Reid, a Maralex employee, responded by

5

email, noted that the wells were situated "on Mickey O'Hare's property," and stated that she envisioned "problems with him granting access" to Trujillo. Id. at 18. One day later, on February 13, 2013, Reid emailed Trujillo again, stating: "I talked to Mickey O'Hare and let him know that you want to inspect the . . . wells. He wants to talk to you directly . . . ." Id.

On February 22, 2013, Trujillo drove to the Parcel in an attempt to examine the wells. Upon arrival, Trujillo found that there was a locked gate that prevented him from examining the wells. That same day, Trujillo spoke by phone with Mickey O'Hare. O'Hare informed Trujillo that he had no right to inspect the wells because O'Hare owned both the surface and mineral rights.

*BLM's issuance of INCs to Maralex*

On February 26, 2013, Trujillo completed four official BLM forms entitled "Notice of Incidents of Noncompliance" (INC). Id. at 23. The INCs noted that Trujillo had attempted unsuccessfully to access the wells on February 22, 2013. The INCs, which were sent to Maralex, alleged that Maralex was in violation of 43 C.F.R. § 3162.1(b), and they gave Maralex until March 25, 2013, to provide Trujillo and the BLM with access to the wells. In the "Remarks" section of the INCs, Trujillo stated: "For corrective action, I will need a key to access the location or be able to put a BLM lock in with it." Id. at 24.

*Maralex's administrative appeal of the INCs*

On March 27, 2013, a law firm representing Maralex and the O'Hares sent a letter to BLM appealing the four INCs. The letter asserted that the BLM had

6

misinterpreted its authority to inspect oil and gas wells located on private land. More specifically, the letter asserted that the BLM "ha[d] limited authority to inspect facilities on Fee Tracts" and that the applicable regulations "only allow[ed] annual inspections" of such wells. Id. at 33. The letter also asserted that "there [wa]s no statutory authority nor . . . any legitimate justification for giving the BLM unbridled discretion to search the facilities at issue in order to ensure that there [wa]s adequate site security measurement and that Maralex [wa]s properly measuring the production and operation of the wells." Id. "Thus," the letter asserted, "BLM's request for a key to any gates to conduct inspections [wa]s violative of Maralex's constitutionally guaranteed protection against unreasonable searches under the Fourth Amendment." Id. Lastly, the letter asserted that "there [wa]s no legal authority for the BLM's demand for unfettered access to the O'Hare's surface." Id. And the letter argued that "[i]f the BLM was entitled to unfettered right to access O'Hare's property under Section 3162.1(b), it would constitute a regulatory taking of O'Hare's property in violation of O'Hare's property rights as guarantee [sic] by the takings clause of the Fifth Amendment." Id. at 34.

On April 10, 2013, the BLM notified Maralex's counsel that it was treating the March 27, 2013 letter "as a request for State Director's review (SDR) . . . under 43 CFR 3165.3." Id. at 88.

On July 9, 2013, the BLM's Deputy State Director, Energy, Lands, and Minerals, Colorado State Office, sent a letter to Maralex's counsel responding to each point raised by Maralex's counsel. The letter disagreed that the applicable

7

regulations allowed only for "annual inspections for fee tracts in a CA." Id. at 90.

Rather, the letter asserted, the "inspected annually" language in the regulation merely

established a minimum standard as to what was to be accomplished. Id. As for its

authority to conduct inspections of the wells, the BLM noted that

> Section 101(b) of the Federal Oil and Gas Royalty Management Act of 1982 (FOGRMA) provides that, "*Authorized and properly identified representatives of the Secretary may without advance notice, enter upon, travel across and inspect lease sites on Federal or Indian lands and may obtain from the operator immediate access to secured facilities on such lease sites, for the purpose of making any inspection or investigation for determining whether there is compliance with the requirements of the minearal [sic] leasing laws and this Act.*"

Id. at 90-91 (italics in original). The BLM in turn stated that "[s]ince the subject

wells' production is subject to a federal CA and the government receives a portion of

the production's royalty, the BLM is responsible for assuring production

accountability" and that "[t]his includes inspections for site security, proper handling,

measurement and reporting of production and protection against product theft." Id. at

91. "Therefore," the letter stated, "BLM must be allowed to perform the production

related inspection which necessitates physical access to the subject wells and their

associated facilities without advance notice." Id. In a section entitled "Decision,"

the letter stated:

> Upon review, the four INCs covering denied access to the subject wells were properly issued and are upheld. The stay of enforcement action granted in our April 10, 2013, letter to Maralex is hereby lifted.
>
> Maralex must provide the BLM Tres Rios Field Office access without advance notice as required by the INCs and the regulations. If Maralex chooses not to provide access as required, Maralex will be subject to assessments pursuant to 43 CFR 3163.1. In addition further

8

non-compliance shall result in proposed civil penalties pursuant to 43 CFR 3163.2(e)(1).

Id. at 93.

On August 20, 2013, Maralex's counsel sent the BLM a notice of appeal of the July 9, 2013 decision. Id. at 97. Maralex's counsel followed that up by filing with the IBLA a Statement of Reasons for Appeal. Id. at 98. The Statement of Reasons argued that the regulation relied on by the BLM, 43 C.F.R. § 3162.1(b), applies only "to Federal and Indian lease sites," and that "there is no statutory authority to support the BLM's suggestion that it has the right to conduct warrantless searches of Maralex's facilities." Id. at 113. "Thus," the Statement of Reasons asserted, "BLM's request violates Maralex's right not to be subject to unreasonable searches as guaranteed by the Fourth Amendment." Id. Lastly, the Statement of Reasons asserted that "if the BLM does have the statutory and regulatory authority to access the O'Hare's Fee Tract at any time, such authority would constitute a regulatory taking of the O'Hare's property in violation of their due process rights under the Fifth Amendment." Id.

On July 10, 2015, the IBLA issued a written decision affirming the BLM's July 9, 2013 decision. In doing so, the IBLA did not address whether plaintiffs were required to provide the BLM with a key or allow the BLM to install its own locks on Maralex's gates, nor did the IBLA address plaintiffs' constitutional arguments.

*The district court proceedings*

9

On September 1, 2015, Maralex and the O'Hares initiated these proceedings by filing a complaint in federal district court against the Secretary, the Department of the Interior, and the United States. The complaint sought reversal of the IBLA's decision, as well as declaratory relief.

On October 19, 2017, the district court issued an order affirming the IBLA's determination. Plaintiffs now appeal.

## II

Plaintiffs raise two issues on appeal: (1) whether they waived their argument that the BLM lacked authority to require them to provide the BLM with keys to the locked gates on the O'Hares' private property or, alternatively, to allow the BLM to place its own locks on those gates; and (2) whether the BLM has statutory or regulatory authority to require plaintiffs to provide the BLM with keys to locked gates on privately-owned lands or, alternatively, to allow the BLM to place its own locks on such gates.[2] As discussed in more detail below, whether plaintiffs waived their argument is a close question, but assuming they did, we nevertheless exercise discretion to address the underlying issue. We in turn conclude that BLM lacked authority to impose the "key or lock" requirement.

*Did plaintiffs waive their argument that the BLM lacked authority to require them to provide keys to their locked gates or to allow the BLM to place its own locks on those gates?*

---

[2] Until recently, plaintiffs asserted three additional issues on appeal, including Fourth and Fifth Amendment challenges to the inspection protocol advocated by the BLM. At oral argument, however, plaintiffs abandoned those issues. Consequently, we do not address them.

As noted, plaintiffs first argue that the district court erred in concluding that they waived their argument that the BLM lacked authority to require them to provide the BLM with keys to locked gates or to allow the BLM to place its own locks on those gates. The district court concluded that plaintiffs "did not present to the IBLA this particular argument that the BLM's corrective action exceeded its authority." Aplt. App. at 207-08. The district court in turn concluded "that Plaintiffs waived this argument for purposes of this appeal and [it] decline[d] to consider it." Id. at 208.

To resolve this issue, we begin by turning to the record. Plaintiffs, in their initial appeal of the INCs, "claim[ed] that BLM ha[d] no statutory authority or legitimate justification giving the BLM unbridled discretion to search the subject well facilities in order to ensure site security and proper measurement" and that, consequently, "the BLM's request for a key to any gates to conduct inspections [wa]s in violation of Maralex's constitutionally guaranteed protection against unreasonable searches under the Fourth Amendment." Aplt. App. at 90.

In their appeal to the IBLA from the State Director's decision denying their initial appeal, plaintiffs argued, in pertinent part, that "there [wa]s no statutory authority nor . . . any legitimate justification for giving the BLM unbridled discretion to search the facilities at issue at any time and without notice," and that, consequently, "BLM's request for a key to any gates to conduct unannounced inspections [wa]s violative of Maralex's constitutionally guaranteed protection against unreasonable searches under the Fourth Amendment." Id. at 102. Plaintiffs further argued that "there [wa]s no statutory support for warrantless, unannounced

11

inspections of [the] Fee Tracts," and thus the BLM could not "rely on" its own regulations "for conducting unannounced, warrantless searches of the sites at issue." Id. at 107–08. Plaintiffs also argued that "Paragraph 13" of the CA "does not provide the BLM with the unlimited right to conduct inspections without advance notice nor does it form the basis for giving the BLM a key to have unlimited physical access to the wells and related facilities on Fee Tracts, which is applicable only to Federal and Indian lease sites." Id. at 112. Lastly, the plaintiffs challenged the State Director's rejection of "the O'Hare's [sic] assertion that forcing them to supply the BLM with a key to a lock to allow the BLM to have physical access to their surface property for unannounced inspections of Maralex's wells and related facilities located on the O'Hare's [sic] surface constitute[d] an unauthorized takings under the Fifth Amendment." Id. at 112-13.

In our view, it is a close question whether plaintiffs presented their argument to the IBLA that BLM exceeded its statutory and regulatory authority by requiring a key or lock in the INCs. On the one hand, plaintiffs clearly argued, as part of their Fourth Amendment challenge, that the BLM lacked both statutory and regulatory authority to impose the key/lock requirement. On the other hand, plaintiffs expressly asserted before the IBLA that it lacked authority to address their Fourth Amendment challenge and they asked the IBLA not to consider it.

Even assuming, however, that plaintiffs failed to properly present to the IBLA their argument that the key/lock requirement exceeded the BLM's statutory and regulatory authority, we nevertheless choose to exercise our discretion to address that

12

issue.[3]  See U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 447–48 (1993) (discussing authority of appellate court to address potentially waived issue).  We have held, albeit in a slightly different context, that we may depart from general waiver principles "particularly when we are presented with a strictly legal question, the proper resolution of which is beyond doubt or when manifest injustice would otherwise result."  Daigle v. Shell Oil Co., 972 F.2d 1527, 1539 (10th Cir. 1992).  Further, in considering whether to address an alternative theory, we take into account (1) "whether the ground was fully briefed and argued here and below," (2) "whether the parties have had a fair opportunity to develop the factual record," and (3) "whether, in light of factual findings to which we defer or uncontested facts, our decision would involve only questions of law."  Elkins v. Comfort, 392 F.3d 1159, 1162 (10th Cir. 2004) (citations omitted).

In this case, the issue of the BLM's statutory and regulatory authority has been fully briefed and argued in this court by both sides.  Further, the factual record is essentially undisputed and, thus, we are presented with only a question of law. Lastly, and perhaps most importantly, the BLM has indicated its intention to enforce the key/lock requirement at the conclusion of this litigation.  On October 22, 2018,

---

[3] We are not aware of, nor has the BLM cited to, any authority holding that preservation of the issue before the IBLA is a jurisdictional prerequisite.  See Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO, 498 U.S. 517, 523 n.3 (1991) ("The judicial review provisions of the APA are not jurisdictional . . . ."); Chissoe v. Zinke, 725 F. App'x 614, 621 (10th Cir. 2018) (stating that "judicial exhaustion requirements under the APA are prudential only."); Vietnam Veterans of Am. v. Shinseki, 599 F.3d 654, 661 (D.C. Cir. 2010) ("We think the proposition that the review provisions of the APA are not jurisdictional is now firmly established.").

we issued an order to show cause directing the parties to address, in pertinent part, the question of whether the BLM was continuing to require Maralex to provide the BLM with a key to the lock on the O'Hares' gate or to allow the BLM to place its own lock on the gate. On December 18, 2018, defendants responded that, indeed, "BLM continues to require Maralex to either provide the agency with a key to the lock on the O'Hares' gate or allow BLM to place its own lock on the gate." Aple. Resp. to Order to Show Cause at 2. Defendants asserted that, "[i]n the absence of compliance with the [key/lock requirement] in the INCs, Mr. O'Hare may refuse BLM access to the wells at any time, as he did in February 2013 (which led to BLM's issuance of the INCs)." Id. at 3. Thus, despite the fact that the INCs were issued nearly six years ago, it is clear that the BLM intends to enforce the key/lock requirement once this litigation ends. For this reason, we conclude that the interests of justice are best served if we address the merits of plaintiffs' argument that BLM lacks statutory and regulatory authority to impose the key/lock requirement.

> *Does the BLM have authority to require a landowner or operator*
> *to provide the BLM with keys to the landowner's locked gates or allow*
> *the BLM to place its own locks on the landowner's gates?*

We now turn to the merits of plaintiffs' argument. Plaintiffs assert that, even assuming some statutory or regulatory authority exists for the BLM to conduct inspections on fee lands without advanced notice, "there are limits to such inspections." Aplt. Br. at 40. Plaintiffs point to the language of 30 U.S.C. § 1718 to support their position. Section 1718, plaintiffs note, "limits the right to enter upon, travel across and inspect lease sites to not only 'authorized' representatives of the

14

Secretary, but to representatives that are 'properly identified.'" Id. And, plaintiffs argue, "[b]ecause the landowner and the operator have the right to ensure that the representative is properly identified, the BLM cannot force either the landowner or the operator to provide a key to the landowner's locked gates or be forced to allow the BLM to place a lock on the landowner's locked gates since by doing so neither the landowner nor operator will be able to check the identification of the person(s) entering upon, travelling across, and/or inspecting the facilities." Id. at 40-41. Lastly, plaintiffs argue that "[a]ll that is required of the operator under Section 1718(b) is to provide 'immediate access to secured facilities' to a properly identified representative of the Secretary." Id. at 41. This means, plaintiffs argue, that "if the operator is on site at the time of the inspection, it is required to open any gates or otherwise secured facilities" and "[i]f the operator is not on the lease site when the authorized, properly identified representative arrives at the lease site, then the operator is required to go to the lease site and provide immediate access." Id.

Defendants argue, in response, that "the INCs' corrective action requiring Plaintiffs to provide BLM with key or lock access is permissible under the statute and the regulations." Aple. Br. at 39. In particular, defendants assert that "FOGRMA and its implementing regulations provide that any person who fails to allow authorized inspections is liable for penalties, which may not be applied if the liable person takes the prescribed corrective action within the required timeframe." Id.

a) *Standard of review*

15

Although this is an appeal from the district court's decision, we accord no particular deference to that decision. Instead, we conduct our own independent review of the agency's decision. Exxon Mobil Oil Corp. v. Norton, 346 F.3d 1244, 1248 (10th Cir. 2003). Under the Administrative Procedures Act, we will "set aside agency's action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Utah Envtl. Cong. v. Bosworth, 439 F.3d 1184, 1188 (10th Cir. 2006) (internal quotations omitted); see 5 U.S.C. § 706(2)(A).

When reviewing an agency's interpretation of a statute it administers, we first determine whether Congress has directly spoken to the precise issue. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842 (1984); Cliffs Synfuel Corp. v. Norton, 291 F.3d 1250, 1257 (10th Cir. 2002). "If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842–43. If, however, the statute is silent or ambiguous on the issue in question, we do not impose our own construction on the statute, but rather ascertain whether the agency's interpretation is a permissible construction of the statute. Id. at 843. If it is, we defer to that interpretation. Id. at 844. Our review of federal regulations is similar. "In the usual course, when an agency is authorized by Congress to issue regulations and promulgates a regulation interpreting a statute it enforces, the interpretation receives deference if the statute is ambiguous and if the agency's interpretation is reasonable." Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117, 2124 (2016). "This principle is implemented by the two-step analysis set forth in Chevron." Id. "At the first step, a

16

court must determine whether Congress has 'directly spoken to the precise question at issue." Encino, 136 S. Ct. at 2124 (quoting Chevron, 467 U.S. at 842). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[4] Chevron, 467 U.S. at 842-43. "If not, then at the second step the court must defer to the agency's interpretation if it is 'reasonable.'" Encino, 136 S. Ct. at 2125 (quoting Chevron, 467 U.S. at 844). "It is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail." Decker v. Nw. Envtl. Def. Ctr., 568 U.S. 597, 613 (2013). "When an agency interprets its own regulation, the Court, as a general rule, defers to it unless that interpretation is plainly erroneous or inconsistent with the regulation." Id. (quotation marks omitted).

b) Analysis

We begin our analysis by briefly examining the overall statutory and regulatory scheme for inspections of oil and gas lease sites that implicate Indian

---

[4] At the first step of the Chevron analysis, "we must giv[e] all undefined terms their ordinary meaning.'" Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc., 764 F.3d 1199, 1227 (10th Cir. 2014) (quoting Fed. Hous. Fin. Agency v. UBS Americas Inc., 712 F.3d 136, 141 (2d Cir. 2013)). "We may consult a dictionary to determine the plain meaning of a term" and may "also take into account the broader context of the statute as a whole when ascertaining the meaning of a particular provision." Conrad v. Phone Directories Co., 585 F.3d 1376, 1381 (10th Cir. 2009) (quotation marks and citation omitted).

mineral interests. In § 1702 of FOGRMA, Congress set forth the following definitions that are relevant to understanding the substantive provisions of the Act:

> (1) "Federal land" means all land and interests in land owned by the United States which are subject to the mineral leasing laws, including mineral resources or mineral estates reserved to the United States in the conveyance of a surface or nonmineral estate;
> . . .
> (3) "Indian lands" means any lands or interest in lands of an Indian tribe or an Indian allottee held in trust by the United States or which is subject to Federal restriction against alienation or which is administered by the United States pursuant to section 14(g) of Public Law 92-203 [43 USC § 1613(g)], as amended, including mineral resources and mineral estates reserved to an Indian tribe or an Indian allottee in the conveyance of a surface or nonmineral estate, except that such term does not include any lands subject to the provisions of section 3 of the Act of June 28, 1906 (34 Stat. 539) [unclassified];
> . . .
> (5) "lease" means any contract, profit-share arrangement, joint venture, or other agreement issued or approved by the United States under a mineral leasing law that authorizes exploration for, extraction of, or removal of oil or gas;
> (6) "lease site" means any lands or submerged lands, including the surface of a severed mineral estate, on which exploration for, or extraction or removal of, oil or gas is authorized pursuant to a lease;
> . . .

30 U.S.C. § 1702(1), (3), (5), (6).

In our view, the plain language of the statutory definition of "lease" includes communitization agreements approved by the United States, such as the one at issue in this case. More specifically, a communitization agreement is a "contract" or "other agreement" that, depending upon the circumstances, has been "approved by the United States under a mineral leasing law," i.e., federal law governing mineral rights on Indian and trust land, "that authorizes exploration for, extraction of, or

18

removal of oil or gas."[5]  Thus, the statutory definition of "lease site" necessarily

includes any lands, including privately-owned lands, on which exploration for and

extraction of oil and gas is occurring pursuant to a communitization agreement.

Section 1718 of FOGRMA, entitled "Inspection," provides in pertinent part as

follows:

> (b) **Inspection of lease sites for compliance with mineral leasing laws
> and 30 USCS §§ 1701 et seq**.  Authorized and properly identified
> representatives of the Secretary may without advance notice, enter upon,
> travel across and inspect lease sites on Federal or Indian lands and may
> obtain from the operator immediate access to secured facilities on such
> lease sites, for the purpose of making any inspection or investigation for
> determining whether there is compliance with the requirements of the
> mineral leasing laws and this Act.  The Secretary shall develop
> guidelines setting forth the coverage and the frequency of such
> inspections.

30 U.S.C. §1718(b).  Although § 1718(b) incorporates the statutory phrase "lease

sites," it proceeds to limit the scope of that phrase by authorizing BLM

representatives to, "without advance notice, enter upon, travel across and inspect"

lease sites that exist "on Federal or Indian lands," i.e., non-fee lands owned by the

United States or held in trust by the United States for a tribe, and that arise out of

---

[5] Neither the IBLA nor the BLM have expressly adopted this broad definition of "lease."  Instead, the IBLA interpreted the identically-worded regulatory definition of the term "lease site" to include more than "Federal or Indian lease sites," and also concluded that the identically-worded regulatory definition of the term "lease" was not incorporated into the regulatory phrase "lease site."  Aplt. App. at 170, 174.  We reject this latter conclusion as inconsistent with the statutory language and normal rules of statutory construction.  In particular, "it is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," and we see no evidence that Congress intended for the term "lease," as used in the term "lease site," to carry a different meaning.  Pereira v. Sessions, 138 S. Ct. 2105, 2115 (2018).

19

contracts or agreements issued or approved by the United States. Further, the statute is silent with respect to how, if at all, BLM representatives may access lease sites on privately-owned lands.

Defendants concede that "Congress did not expressly address the application of Section 1718(b) inspection authority to fee lands committed to communitization agreements." Aple. Br. at 15. But, defendants argue, "[g]iven that ambiguity, BLM reasonably exercised its delegated rulemaking authority to include the inspection of fee lands that, like the O'Hares', are subject to a communitization agreement that was approved by the Department and involves Indian lands where the affected tribe shares in the production and royalties of the oil and gas operation." Id.

Defendants' arguments hinge on the threshold question of whether § 1718(b) is ambiguous or not. A statute is "ambiguous if it is reasonably susceptible to more than one interpretation or capable of being understood in two or more possible senses or ways." Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc., 764 F.3d 1199, 1226 (10th Cir. 2014) (quotations and citations omitted); see Chickasaw Nation v. United States, 534 U.S. 84, 90 (2001). Although it may be reasonable from a policy standpoint for the BLM to have authority to inspect fee lands that are subject to a communitization agreement approved by the United States, § 1718(b) simply is not ambiguous and thus does not provide the BLM with any authority to exercise its delegated rulemaking authority on that issue. As noted, § 1718(b) quite clearly limits the BLM's inspection authority to lease sites on federal and Indian lands.

20

To be sure, § 1718(b) is silent with respect to inspections of lease sites on fee lands, but that silence does not render the statute ambiguous. See Spring Creek Expl. & Prod. Co. v. Hess Bakken Inv., II, LLC, 887 F.3d 1003, 1018 (10th Cir. 2018) ("silence is not ambiguity"). When the Supreme Court has discussed the exercise of agency discretion "'in the interstices created by statutory silence,'" it has done so only when "considering undefined terms in a statute or statutory directive to perform a specific task without giving detailed instructions." Marlow v. New Food Guy, Inc., 861 F.3d 1157, 1162 (10th Cir. 2017) (quoting Util. Air Regulatory Grp. v. EPA, 134 S. Ct. 2427, 2445 (2014) (internal quotation marks omitted)). And that is simply not the case with § 1718(b). As noted, § 1718(b) plainly focuses on lease sites "on Federal or Indian lands" and does not otherwise leave any terms or statutory directives undefined.

For these reasons then, we conclude that § 1718(b) does not afford the BLM with authority to inspect lease sites on privately-owned lands. Thus, we must look elsewhere to determine whether any authority exists for the BLM's proposed inspections of the wells in this case.

The Secretary has issued regulations implementing the various statutory directives outlined by Congress in FOGRMA. To begin with, 43 C.F.R. § 3161.1(b) states:

> The regulations in this part and 43 CFR part 3170, including subparts 3173, 3174, and 3175, relating to site security, measurement of oil and gas, reporting of production and operations, and assessments or penalties for non-compliance with such requirements, *are applicable to all wells and facilities on State or privately owned lands committed to a*

21

*unit or communitization agreement, which include Federal or Indian lease interests*, notwithstanding any provision of a unit or communitization agreement to the contrary.

43 C.F.R. § 3161.1(b) (emphasis added).

In turn, 43 C.F.R. § 3161.3, entitled "Inspections," states:

(a) The authorized officer shall establish procedures to ensure that each Federal and Indian lease site which is producing or is expected to produce significant quantities of oil or gas in any year or which has a history of noncompliance with applicable provisions of law or regulations, lease terms, orders or directives shall be inspected at least once annually. Similarly, each lease site on non-Federal or non-Indian lands subject to a formal agreement such as a unit or communitization agreement which has been approved by the Department of the Interior and in which the United States or the Indian lessors share in production shall be inspected annually whenever any of the foregoing criteria are applicable.
(b) In accomplishing the inspections, the authorized officer may utilize Bureau personnel, may enter into cooperative agreements with States or Indian Tribes, may delegate the inspection authority to any State, or may contract with any non-Federal Government entities. Any cooperative agreement, delegation or contractual arrangement shall not be effective without concurrence of the Secretary and shall include applicable provisions of the Federal Oil and Gas Royalty Management Act.

43 C.F.R. § 3163.3(a) and (b).[6]

Lastly, 43 C.F.R. § 3162.1, which discusses "General requirements" for

operating rights owners and operators, states:

(a) The operating rights owner or operator, as appropriate, shall comply with applicable laws and regulations; with the lease terms, Onshore Oil

---

[6] The Secretary's authority to enact the portion of this regulation concerning inspections on privately-owned lands arises both from the general purposes provisions of FOGRMA, § 1701(b)(3)-(5), as well as § 1711(a) and (b). Section 1711(a) directs the Secretary, in part, to "establish a comprehensive inspection . . . system," and §1711(b) directs the Secretary to conduct annual inspections of certain lease sites, without limitation to sites contained on Federal or Indian lands.

22

and Gas Orders, NTL's; and with other orders and instructions of the authorized officer. These include, but are not limited to, conducting all operations in a manner which ensures the proper handling, measurement, disposition, and site security of leasehold production; which protects other natural resources and environmental quality; which protects life and property; and which results in maximum ultimate economic recovery of oil and gas with minimum waste and with minimum adverse effect on ultimate recovery of other mineral resources.

(b) *The operator shall permit properly identified authorized representatives to enter upon, travel across and inspect lease sites and records normally kept on the lease pertinent thereto without advance notice. Inspections normally will be conducted during those hours when responsible persons are expected to be present at the operation being inspected. Such permission shall include access to secured facilities on such lease sites for the purpose of making any inspection or investigation for determining whether there is compliance with the mineral leasing laws, the regulations in this part, and any applicable orders, notices or directives.*

(c) *For the purpose of making any inspection or investigation, the Secretary or his authorized representative shall have the same right to enter upon or travel across any lease site as the operator has acquired by purchase, condemnation or otherwise.*

43 C.F.R. § 3162.1 (emphasis added).[7]

The regulatory provisions thus provide for an inspection framework that applies to federal, Indian, and certain privately-owned lands, but that, not surprisingly, provides the BLM with greater inspection authority over federal and Indian lands than privately-owned lands. With respect to lease sites on federal and Indian land that are "producing or . . . expected to produce significant quantities of oil or gas in a year or which ha[ve] a history of noncompliance with applicable

---

[7] It was this regulation that Maralex was cited for violating in the four INCs. Aplt. App. at 168.

23

provisions of law or regulations," BLM representatives must inspect such lease sites "at least once annually." 43 C.F.R. § 3161.3(a). As for lease sites on privately-owned lands that are committed to a unit or communitization agreement that has been approved by the Department of the Interior, they are required to "be inspected annually whenever" they are "producing or . . . expected to produce significant quantities of oil or gas in any year or" if they "ha[ve] a history of noncompliance with applicable provisions of law or regulations."[8] 43 C.F.R. § 3161.3(a). They can also be inspected by the BLM for purposes of assessing "site security, measurement, reporting of production and operations, and assessments or penalties for noncompliance with such requirements." 43 C.F.R. § 3161.2. Further, the operating rights owner or operator of any such lease site on privately-owned land is required to "permit properly identified authorized representatives" of the BLM "to enter upon, travel across and inspect lease sites and records normally kept on the lease pertinent thereto without advance notice." 43 C.F.R. § 3162.1(b). Any such inspections, however, must normally "be conducted during those hours when responsible persons are expected to be present at the operation being inspected." Id. In addition, "[s]uch permission" by the operating rights owner or operator "shall include access to secured facilities on such lease sites for the purpose of making any inspection or investigation for determining whether there is compliance with the mineral leasing

---

[8] In this case, the IBLA expressly found that the wells at issue "are producing or expected to produce significant quantities of oil and gas," thus rendering the wells subject to annual inspection under § 3163.3(a). Aplt. App. at 172.

24

laws, the regulations . . . , and any applicable orders, notices or directives." Id. Lastly, BLM representatives are, "for the purpose of making any inspection or investigation," afforded the same right of entry to and travel access across the lease site "as the operator has acquired by purchase, condemnation or otherwise." Id. § 3162.1(c).

Thus, at least for purposes of this case, the key difference between lease sites on federal/Indian lands and lease sites on privately-owned land subject to a communitization agreement is how BLM representatives may access them. For lease sites on federal/Indian lands, BLM representatives have the right to enter those sites by themselves without first seeking permission from the operating rights owner or operator. In contrast, for lease sites on privately-owned lands, BLM representatives may not independently enter the sites, but instead must seek entry (but do not have to give advance notice) from the operating rights owner or operator and the operating rights owner or operator, as noted, is obligated to allow such entry.

As for how often BLM representatives may inspect the wells, the regulations contain no limitation. Indeed, the only reference to frequency of inspections is contained in § 3161.3(a), which, as noted, requires lease sites meeting certain requirements to be inspected at least once annually. Section 3161.3(a) does not, however, impose any upper limit on the number of inspections. In other words, as both the State Director and the IBLA concluded in their respective decisions, "[t]he [regulatory] wording 'inspected annually' is a minimum standard not a maximum limitation." Aplt. App. at 90; see id. at 176 n.10 (IBLA decision).

In sum, the BLM had authority to inspect the wells at issue. The question remains, however, whether BLM had authority to require Maralex to provide BLM with "a key to access the location or" allow BLM to install its own locks. Aplt. App. at 24).

We agree with plaintiffs that the BLM lacks authority to require an operator or landowner to provide the BLM with a key to the landowner's locked gates or to allow the BLM to place its own locks on the landowner's locked gates. But we arrive at this conclusion in a different manner than suggested by plaintiffs. Although plaintiffs base many of their arguments on the language of § 1718(b), that statutory subsection, as discussed above, does not apply at all to lease sites on privately-owned lands. Instead, the parameters of inspections of lease sites on privately-owned lands are outlined in two regulations: 30 C.F.R. §§ 3162.1 and 3163.3. Neither of those regulations provide any authority for the BLM to require an operating rights owner or operator (or, for that matter, a private landowner) to (a) provide BLM with a key to a lease site on privately-owned land, or (b) to install a BLM-lock on the gates to such lease site. Rather, as discussed above, the BLM has the right to conduct unannounced inspections of such sites, but must rely on the operating rights owner or operator to afford them entry to the lease site.

Defendants, for their part, cite in their appellate brief to the statutory and regulatory provisions authorizing the BLM to take "corrective action." Aple. Br. at 39 (citing 30 U.S.C. §§ 1719(a)(2)(A), (a)(2)(B) and 43 C.F.R. § 3163.1(a)(4)). Those statutory provisions, however, speak only in terms of monetary "civil

26

penalties" (the amount of which depends upon how long the violation has gone on). 30 U.S.C. §§ 1719(a)(2), (b). The regulatory provisions also mention the possibility of lease cancellations and criminal penalties. 43 C.F.R. §§ 3163.1(a)(5), 3163.3. Notably, nothing in the statutory and regulatory provisions mentions the remedy imposed on the plaintiffs in this case, i.e., requiring them to provide BLM with a key or to allow BLM to install its own locks. Although defendants concede this point, they nevertheless argue that "it is reasonable to conclude that when a landowner denies BLM entry, the very least that the agency can permissibly do under the statute is order any reasonable remedy that will yield the access required to carry out Congress's charge." Id. at 39-40. We reject that argument. Requiring the provision of a key or lock access is, without question, a drastic measure that would, at a minimum, require express congressional approval. Because no such approval appears in the relevant statutes or regulations, defendants' arguments must be rejected.

III

We REVERSE and REMAND to the district court with directions to enter judgment in favor of plaintiffs on their claim that the BLM lacks authority to require plaintiffs to provide the BLM with a key to access the wells at issue or to allow BLM to install its own locks.

27