FILED
United States Court of Appeals
Tenth Circuit

November 24, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

LT. COL. PATRICK SCHREIBER,

     Plaintiff - Appellant,

v.

KENNETH T. CUCCINELLI, Acting
Director, U.S. Citizenship and
Immigration Services; DAVID
DOUGLAS, District Director, U.S.
Citizenship and Immigration Services;
CHAD F. WOLF, Acting Secretary,
U.S. Department of Homeland
Security; WILLIAM BARR, Attorney
General, the U.S. Department of
Justice,[*]

     Defendants - Appellees,

_____

CHILDREN AND FAMILY LAW
CENTER; ADOPTEE RIGHTS
CAMPAIGN,

     Amici Curiae.

No. 18-3215

_____

[*]     Plaintiff commenced his lawsuit against certain specified federal-agency defendants in their official capacities. The listed Defendant-Appellees reflect the automatic substitution of officials pursuant to Federal Rule of Appellate Procedure 43(c)(2).

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:17-CV-02371-DDC-JPO)**

Robert D. Friedman, Institute for Constitutional Advocacy and Protection (Rekha Sharma-Crawford, Sharma-Crawford, Attorneys at Law, LLC; Joshua A. Geltzer, Institute for Constitutional Advocacy and Protection, with him on the briefs), Washington, D.C., for Plaintiff-Appellant.

T. Monique Peoples, Senior Litigation Counsel, U.S. Department of Justice, Office of Immigration Litigation (Joseph H. Hunt, Assistant Attorney General, U.S. Department of Justice; William C. Peachey, Director, Office of Immigration Litigation; Elianis N. Perez, Assistant Director, Office of Immigration Litigation, with her on the brief), Washington, D.C., for Defendants-Appellees.

Before **TYMKOVICH,** Chief Judge, **BALDOCK**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

This case presents the issue of whether a father's adopted child can qualify as his "legitimated" child for purposes of § 101(b)(1)(C) of the Immigration and Nationality Act ("Act"), 8 U.S.C. § 1101(b)(1)(C), when the child is not his biological child. The Act provides, in relevant part, that "an unmarried person under twenty-one years of age" qualifies as a "legitimated" child if she is "legitimated under the law of [her] residence or domicile, or under the law of [her] father's residence or domicile," and if "[her] legitimation takes place before

2

[she] reaches the age of eighteen years." 8 U.S.C. § 1101(b)(1)(C). The parties agree that the Act looks to state law to determine *how* a parent may legitimate an eligible child (that is to say, for the legal procedures through which legitimation may be effected). But they disagree over whether the Act also looks to state law to define *whom* (i.e., which children) a parent may legitimate.

Accordingly, we must now decide whether the Board of Immigration Appeals ("BIA")—that is, the federal agency charged with ultimately interpreting the Act—erred in ruling that, because it is implicit in the concept of legitimation that a parent may legitimate only his *biological* children, the Act need not and does not look to state law to see whether parents may legitimate someone other than their biological children. Like the district court, we determine that the BIA correctly interpreted the Act's plain meaning and, thus, did not err in ruling that a parent's *non*-biological child may *not* be his "legitimated" child within the meaning of the Act. We also hold that the district court did not violate the Supreme Court's rule in *Darby v. Cisneros*, 509 U.S. 137 (1993), when it declined to entertain the gender-discrimination challenge of plaintiff-appellant Lieutenant Colonel Patrick Schreiber ("Mr. Schreiber") to the BIA's interpretation of the Act because he failed to exhaust this argument in his purportedly optional appeal to the BIA. Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm** the judgment below.

3

# I

## A

We begin by outlining in more detail the legal contours of the dispute and our resolution of it. When Mr. Schreiber asked the U.S. Citizenship and Immigration Services ("USCIS") to classify his adopted daughter, Hyebin, as his "child" for purposes of § 101(b)(1) of the Act to start her on the path to obtaining lawful permanent residency, the USCIS notified him that it planned to deny his I-130 petition.[1] The USCIS explained that Hyebin did not qualify under the Act as his "adopted" child because the Act limited that category to children "adopted while under the age of sixteen years," *see* 8 U.S.C. § 1101(b)(1)(E)(i), whereas Mr. Schreiber had adopted her when she was seventeen years old. Mr. Schreiber replied that Hyebin instead was his "legitimated" child, asserting in support that (1) Kansas law considers an adopted child to be "legitimated," and (2) the Act defines the term "child" to include "a child legitimated under the law of the child's [or the father's] residence or domicile, . . . if such legitimation takes place before the child reaches *the age of eighteen years*." *Id.* § 1101(b)(1)(C) (emphasis added).

---

[1] The parties do not dispute that Hyebin satisfied at least one element of a "child" under the Act—*viz.*, she was "an unmarried person under twenty-one years of age." 8 U.S.C. § 1101(b)(1). We refer to her as "Hyebin" in keeping with the naming convention that Mr. Schreiber employs in his briefing.

The USCIS and later the BIA rejected Mr. Schreiber's position on the ground that Hyebin could not be his "legitimated" child under the Act because she was not his biological child. In pursuing judicial review of the BIA's final agency action in federal district court, Mr. Schreiber raised for the first time a gender-discrimination challenge to the BIA's interpretation of the statutory term "legitimated." The district court held that the BIA had correctly interpreted the term's unambiguous meaning and declined to consider Mr. Schreiber's gender-discrimination challenge because he had failed to raise it in his purportedly optional administrative appeal to the BIA. Mr. Schreiber timely appeals from the district court's judgment, which upheld the BIA's rejection of his I-130 petition.

We agree with the district court that when the Act speaks of a "legitimated" child in 8 U.S.C. § 1101(b)(1)(C), Congress unambiguously meant a child who is the biological child of her legitimating parent. We further conclude that the district court properly declined to review Mr. Schreiber's late-blooming gender-discrimination challenge to the BIA's final agency action. Therefore, we affirm the district court's judgment.

**B**

Mr. Schreiber and his wife are United States citizens and Kansas residents. In 2012, Hyebin, who is the niece of Mr. Schreiber's wife, moved from her native South Korea to Kansas in order to live with the Schreibers and attend high school.

5

In 2014, the Schreibers adopted Hyebin under Kansas law with the consent of her biological parents. She was seventeen years old. The Kansas adoption decree stated that Hyebin "is hereby the child and heir-at-law" of the Schreibers, who "are entitled to exercise any and all rights of parents of [Hyebin] and are subject to all of the liabilities of that relationship." Aplt.'s App. at 207 (Decree of Adoption, dated Nov. 17, 2014). Kansas issued Hyebin a new birth certificate listing the Schreibers as her parents. No one before us doubts the authenticity of the familial bond that Hyebin shares with her parents.

In 2015, Mr. Schreiber filed an I-130 petition with the USCIS, seeking to have Hyebin classified as his "child" for purposes of 8 U.S.C. § 1101(b)(1) and stating that he was related to her "by adoption." Id. at 194 (I-130 Pet., filed Apr. 14, 2015). Mr. Schreiber filed the petition with the assistance of counsel, who attached a legal memorandum contending that Hyebin was Mr. Schreiber's "legitimated" child because (1) she was "born out of [the Schreibers'] wedlock" and was now "fully and lawfully" his child, and (2) the State of Kansas had "erase[d] any legal distinctions between natural children and legitimized children." Id. at 183 (Mem. of Law in Supp. of I-130 Pet., dated Apr. 13, 2015). The USCIS responded by sending Mr. Schreiber a "Notice of Intent to Deny," informing him that "because [Hyebin] was sixteen years or older at the time of adoption, it would appear that [she] cannot be classified as [his] adopted child for

6

immigration purposes." *Id.* at 173 (Notice of Intent to Deny, dated Nov. 10, 2015). Mr. Schreiber reminded the USCIS by letter that he was petitioning to have Hyebin declared his "child" based solely on "the theory" that she "should and would be considered a legitimated child under the [Act]." *Id.* at 178 (Pet'r's Letter to USCIS, dated Nov. 23, 2015). He did not raise before the USCIS the argument that the U.S. Constitution required the government to interpret the Act in a manner that deemed Hyebin to be his "legitimated" child.

The USCIS denied Mr. Schreiber's petition on the basis that Hyebin was neither his "adopted" child nor his "legitimated" child, for purposes of "section 101(b)(1) of the Act," i.e., 8 U.S.C. § 1101(b)(1). *Id.* at 171 (USCIS Decision, dated June 10, 2016). The USCIS determined that Hyebin could not "qualify as [Mr. Schreiber's] legitimated child" under § 1101(b)(1)(C) because Mr. Schreiber was "not [her] natural father." *Id.*

Mr. Schreiber appealed from the USCIS's decision to the BIA. He conceded that the BIA had been clear in *In re Bueno-Almonte* ("*Bueno*"), 21 I. & N. Dec. 1029 (BIA 1997), that the very concept of legitimation implies that only a child's natural (i.e., biological) parent can legitimate her. Mr. Schreiber nonetheless argued that, for immigration purposes, Hyebin qualified as his "legitimated" child because (1) the Act "g[ave] total deference to State law to determine whether or not [a] child is considered 'legitimated,'" and (2) "Kansas

7

law authorizes adoption as a method of legitimation." *Id.* at 88, 91 (Br. in Supp. of Appeal, dated July 25, 2016). Mr. Schreiber also asserted that if Hyebin were his "legitimated" child under Kansas law, but the BIA did not acknowledge her as such, the BIA would thereby deprive him of "an essential part of the Liberty protected by the Fifth Amendment," *id.* at 92 (quoting *U.S. v. Windsor*, 570 U.S. 744, 769 (2013), and "deny her equal protection," *id.*

The Washburn Law Clinic appeared before the BIA as *amicus curiae* and asserted that the BIA's interpretation of the Act would violate Mr. Schreiber's "right to equal protection" if it distinguished between "parents who derive paternity by adoption and those who derive paternity by biology . . . in such a way that merely perpetuate[d] the odious regime against 'illegitimate' children that haunted Anglo-American law for centuries." *Id.* at 145 (Br. of Amicus Curiae, dated Mar. 27, 2017).

In a single-member decision, adhering to *Bueno*, the BIA upheld the USCIS's denial of Mr. Schreiber's petition under the rationale that a parent may legitimate only his "biological child." *Id.* at 125 (Decision of the BIA, dated June 5, 2017). "To the extent that constitutional arguments have been raised," it reasoned, "the [BIA] does not have jurisdiction to rule on the constitutionality of the laws it administers." *Id.*

Mr. Schreiber then sought judicial review in federal district court of the BIA's final agency action, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. He renewed his statutory arguments that the Act defers entirely to state law when determining whether a child has been legitimated and that Kansas law considers adopted children to be legitimated children. And he raised for the first time an equal-protection challenge in which he contended that the BIA's interpretation of the Act had the effect of discriminating against him on the basis of gender because—following that interpretation—immigration officials did not recognize his adoption of his non-biological child as a "legitimation" under the Act, whereas immigration officials—under established policy—did recognize the state-law legitimations of children lacking any genetic relationship with their legitimating mother (*viz.*, children born to women who used assisted reproductive technology).[2]

The district court upheld the BIA's decision—ruling that the agency's interpretation of the statutory term "legitimated" child accorded with its unambiguous meaning. Aplt.'s App. at 26–27 (Mem. & Order, filed Sept. 28, 2018). The district court declined to consider Mr. Schreiber's gender-

---

[2] Mr. Schreiber also presented to the district court a Tenth Amendment challenge to the BIA's interpretation of the Act. *See* Aplt.'s App. at 252 (Pl. Opening Br., filed Dec. 22, 2017). He has since abandoned that argument. *See* Aplt.'s Opening Br. at 9 n.2.

discrimination-based equal-protection challenge to the BIA's interpretation of the Act because he had failed to present that challenge to the BIA. This timely appeal follows.

## II

The first issue we must consider is whether the BIA has properly construed the meaning of the phrase "a child legitimated under the law of the child's [or the father's] residence or domicile"—as it is used in 8 U.S.C. § 1101(b)(1)(C)—and, more specifically, the term "legitimated." The BIA, relying on its precedent in *Bueno*, held that a child "must be the biological child" of a legitimating parent "to qualify as the legitimated child of [the parent]" under the Act. Aplt.'s App. at 125.

The government asserts that the Act requires "a biological relationship between [the] parent and child" and urges us to affirm the BIA under either the Act's unambiguous meaning or the deference we grant to an agency's reasonable interpretation of an ambiguous statute under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Aplee.'s Resp. Br. at 14, 31. Mr. Schreiber, in contrast, contends that the statute unambiguously looks to state law to determine whether a child has been properly legitimated and, in any event, does not add a biological-relationship requirement to that purely state-law determination. *See* Aplt.'s Opening Br. at 16–19, 27–31. Mr. Schreiber

10

maintains in the alternative that, if the Act is ambiguous on this point, the BIA's interpretation of it is unreasonable and does not warrant *Chevron* deference. *Id.* at 32–34. In our view, the BIA is correct: that is, it is implicit in the concept of legitimation that only a child's biological parent can legitimate her, and the statute is unambiguous in this respect.

## A

"Although this is an appeal from the district court's decision, we accord no particular deference to that decision" and "conduct our own independent review of the agency's decision." *Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, 1198 (10th Cir. 2019); *see N.M. Health Connections v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1138, 1161 (10th Cir. 2019) ("'In reviewing the agency's action, we must render an independent decision using the same standard of review applicable to the [d]istrict [c]ourt['s]' review." (alterations in original) (quoting *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994))).

The question here is whether the statutory phrase "a child legitimated under the law of the child's [or the father's] residence or domicile" requires the child's legitimating parent to be her biological parent. We "generally afford *Chevron* deference to the BIA's interpretation of the [Act]" because "Congress charged the Attorney General with administering the [Act], and the Attorney General delegated that duty to the BIA." *Rangel-Perez v. Lynch*, 816 F.3d 591, 597 (10th

11

Cir. 2016); *see INS v. Aguirre-Aguirre*, 526 U.S. 415, 424–25 (1999) (holding that *Chevron* deference applies when the BIA gives ambiguous statutory terms in the Act "concrete meaning through a process of case-by-case adjudication" (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 448 (1987))); *Barrera-Quintero v. Holder*, 699 F.3d 1239, 1244 (10th Cir. 2012) (holding that *Chevron* deference extends to a nonprecedential, single-member BIA decision, as here, "if it relies on prior BIA precedent addressing the same question" (quoting *Efagene v. Holder*, 642 F.3d 918, 920 (10th Cir. 2011))); *see also* 8 U.S.C. § 1103(g) (setting forth the Attorney General's powers and duties under the Act). But we may defer to the BIA's interpretation *only* when "the statute is ambiguous or silent as to the issue at hand." *Flores-Molina v. Sessions*, 850 F.3d 1150, 1157 (10th Cir. 2017) (quoting *Carpio v. Holder*, 592 F.3d 1091, 1096 (10th Cir. 2010)). We conclude that the statutory language at issue here is unambiguous; it requires the child's legitimating parent to be her biological parent.

In determining the meaning of a statute "[a]t the first step of the *Chevron* analysis, 'we must giv[e] all undefined terms their ordinary meaning.'" *Maralex Res.*, 913 F.3d at 1199 n.4 (last alteration in original) (quoting *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1227 (10th Cir. 2014)); *see also Harbert v. Healthcare Servs. Grp., Inc.*, 391 F.3d 1140, 1147 (10th Cir. 2004) (describing *Chevron*'s "two-step inquiry" and recounting that, at

the first step, the inquiry is into "whether Congress has directly spoken to the precise question at issue" (quoting *Chevron*, 467 U.S. 837, 842 (1984))). We focus "on the ordinary meaning of the [term] at the time Congress enacted it." *Nat'l Credit Union Admin. Bd.*, 764 F.3d at 1227 (alteration in original) (quoting *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 184 (2004) (plurality opinion)).

Congress enacted the provision at issue in this case, § 101(b)(1)(C), in 1952 as part of the original Act. *See* Act of June 27, 1952, ch. 477, § 101(b)(1)(C), 66 Stat. 163, 171 (1952). The Supreme Court has stated that because "Congress has been actively engaged in delineating just how broad it wishes the [Act's] definition of 'child' to be," "we are especially bound to pay heed to the plain mandate of the words Congress has chosen." *INS v. Hector*, 479 U.S. 85, 90 n.6 (1986) (per curiam); *see also id.* at 88 (observing that 8 U.S.C. § 1101(b)(1)'s "definition of the term 'child' is particularly exhaustive").

The word "legitimated" when used to describe a "child" has long meant something very specific in the law. In *Pfeifer v. Wright*, 41 F.2d 464 (10th Cir. 1930), for example, we explained that—as understood at common law—the legal process of "legitimation" involved taking "an illegitimate child," who "was without right even to the name of its *natural father*," and "placing the child in all respects upon the same footing as if begotten and born in wedlock." *Id.* at 465–66 (emphasis added). We noted that "by whatever method made, when made,

13

the [legitimated] child is invested with all the rights of a lawful child," "[i]ts civil and social status becomes that of *a lawful child of the natural father*, and the child and father thereafter stand in their relations to each other as though the birth had been during wedlock." *Id.* at 466 (emphasis added). We observed as well that there was no "uniform" standard for legitimation among "the several states"—some states "require[d] marriage of the mother and putative father and recognition of the child," whereas other states required "less exacting [acts] to effect legitimation"—and that the "[l]aws of the domicile of the father at the time he acts determine the effect of his acts, and if his acts are such as to effectuate legitimation as declared by those laws, the status of the child is thereby changed from illegitimate to legitimate." *Id.*

In *Pfeifer*, we reviewed whether an illegitimate child had been legitimated under Kansas law because her father, who never married her mother, nonetheless openly recognized her as his daughter, helped raise her as a child, and regularly provided for her and later her children, "show[ing] a fatherly affection for [her] from her birth until his death." *Id.* at 465. The question of whether the father had thereby legitimated his daughter was relevant because he had amassed a considerable estate in Oklahoma and died without any heirs or survivors other than his wife unless, of course, his biological daughter also was one. *Id.* We concluded that although the father's acts had satisfied the requirements of a

Kansas statute that authorized illegitimate children to inherit property in Kansas under specified conditions, the daughter had not thereby been legitimated because the statute did not display "a legislative intention to change the status of a [covered] child from illegitimate to legitimate." *Id.* at 467. The daughter, therefore, could not hold herself out to Oklahoma as her father's legitimated child and heir. *Id.* at 468.

In defining the legal backdrop for its ruling, *Pfeifer* explained that legitimation was traditionally understood to be a state-law process whereby a father recognized his natural (i.e., biological) child—born out of wedlock—as his own, converting her into his legitimate child, and that the specific means by which the father accomplished that recognition (of his paternity) was left to state law. *See id.* at 465–66. We also learned from *Pfeifer* that, traditionally, a child was not deemed to be legitimated unless the state law of such a father's domicile itself said that the father's actions were sufficient to legitimate the child. *See id.* at 466. Thus, our precedent in *Pfeifer* highlights that, traditionally, the concept of "legitimation" effectively runs along two axes: one defines *who* can be legitimated (*viz.*, the biological offspring of the legitimating parent), and the other defines *how* they can be legitimated (*viz.*, by means of state law processes disclosing a legislative intent to effectuate their legitimation).

We conclude that the Congress that enacted the Act in 1952 intended to employ this traditional understanding of *whom* a parent may legitimate—only his biological offspring—when referring to "legitimation" and "a child legitimated" in § 101(b)(1)(C). 66 Stat. at 171 (codified at 8 U.S.C. § 1101(b)(1)(C)). Congress used "legitimation" only three other times in the original 1952 Act—in §§ 309(a), 309(b), and 321(a)(3), all of which concerned the naturalization of children. *Id.* at 238, 245. In each instance, the Act plainly used the term "legitimation" to refer to a method of "establish[ing] . . . the paternity of [a] child . . . born out of wedlock." *Id.* at 238; *see Miller v. Albright*, 523 U.S. 420, 435 (1998) (plurality opinion) (recognizing that § 309(a) used legitimation as a "means of proving a biological relationship" between "a [child] born out of wedlock" and her biological father); *Matter of Cross*, 26 I. & N. Dec. 485, 492 (BIA 2015) (recognizing that § 321(a)(3) had used "legitimation . . . as a mechanism for establishing paternity").

Absent evidence that Congress intended the term legitimation to mean different things throughout the Act, "it is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." *Maralex Res.*, 913 F.3d at 1200 n.5 (quoting *Pereira v. Sessions*, 138 S. Ct. 2105, 2115 (2018)); *see Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (calling this rule a "natural presumption" (quoting *Atl.*

16

*Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932))); *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992) (stating it is a "basic canon of statutory construction that identical terms within an Act bear the same meaning"); *see also Nat'l Credit Union Admin. Bd.*, 764 F.3d at 1230 ("Even when a statute does not explicitly define a particular term, we might gain understanding of the term from how it is used elsewhere in the statute."); *Utah v. Babbitt*, 53 F.3d 1145, 1149 (10th Cir. 1995) ("[S]tatutory terms are often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes [the term's] meaning clear . . . ." (alteration and omission in original) (quoting *Rake v. Wade*, 508 U.S. 464, 474 (1993))). Thus, because we see no reason why Congress meant "legitimation" to mean something else in § 101(b)(1)(C) than it did in other sections of the Act, we are inclined to conclude that § 101(b)(1)(C) uses the term "legitimation" to refer to a change-of-status process between only a child and her *biological* parent.

We find further support for such a conclusion in dictionary definitions of the word "legitimation" (or derivatives thereof) as it is used to describe a child. *See Maralex Res.*, 913 F.3d at 1199 n.4 (observing that "[w]e may consult a dictionary to determine the plain meaning of a term" (quoting *Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1381 (10th Cir. 2009))). In *Blythe v. Ayres*, 31 P. 915 (Cal. 1892), the California Supreme Court observed that the "law

17

dictionaries" of the late nineteenth century, including Black's, Bouvier's,

Anderson's, and Rapalje's, agreed that there was a fundamental legal distinction

between an adopted child and a legitimated child in Anglo-American law:

"[a]doption, properly considered, refers to persons who are strangers in blood;

legitimation, to persons where the blood relation exists." *Id.* at 916; *see also id.*

("This is the distinguishing feature between adoption and legitimation, as

recognized by all the standard law-writers of the day who have written upon the

subject; and for the reason that the text-writers and the decisions of courts, to

which we shall look for light and counsel, treat the subject [of when a father

adopts his illegitimate biological child] as a question of legitimation, we shall

view the matter from that stand-point.").

And, from an examination of historically relevant legal and non-legal

dictionaries, it seems clear to us that the concept of a "legitimated" child that

Congress understood when it enacted the Act in 1952 was restricted to children

who were the biological offspring of the legitimating parent. *Compare Adoption*

*of Child*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) [hereinafter

BALLENTINE'S] ("The means by which the legal relationship of parent and child

between persons who are *not so related by nature* is established or created . . . ."

(emphasis added)), *and Adoption*, WEBSTER'S THIRD NEW INT'L DICTIONARY

(1961) [hereinafter WEBSTER'S] ("[T]o take by free choice into a close

18

relationship previously not existing esp. by a formal legal act . . . *specif*: to take voluntarily *(a child of other parents)* to be in the place of or as one's own child . . . ."), *with Legitimation*, BALLENTINE'S ("In the accepted sense, the act of giving the status of a legitimate child to one born out of wedlock, such being done sometimes by statute . . . but most frequently *by the subsequent marriage of the parents* (emphasis added)), *and Legitimate*, WEBSTER'S ("to put (a bastard) in the position or state of a legitimate child before the law by legal means (as *the subsequent marriage of the parents*)" (emphasis added)). *Compare also Adopt*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1969) ("To take into one's family *through legal means* and raise as one's own child." (emphasis added)), *with Legitimate*, *id.* ("Born in wedlock.").[3] Indeed, that fundamental legal distinction between adoption and legitimation continues to this day. *Adoption*, BLACK'S LAW DICTIONARY (11th ed. 2019) [hereinafter BLACK'S] ("Adoption is distinguishable from legitimation . . . . Adoption usu. refers to an act between persons unrelated by blood; legitimation refers to an act between persons related by blood.").

---

[3]     *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 418–19, 422–23 (2012) (listing among the "primary principles . . . in using dictionaries" the principle that "[d]ictionaries tend to lag behind linguistic realities" and, for the time period 1951–2000, including (among others) the legal and non-legal dictionaries cited in the foregoing *compare* and *compare also* citations).

To be sure, Congress has said that a child will be considered "legitimated" for purposes of the Act only if she has been "legitimated under the law of [her or her father's] residence or domicile." 8 U.S.C. § 1101(b)(1)(C). But we do not read the Act as thereby providing that the concept of "legitimation" itself is an empty vessel that states may fill however they wish. To the contrary, we believe for the above reasons that Congress's use of the term "legitimated" in § 1101(b)(1)(C) unambiguously contemplates—as a threshold matter—that only a legitimating parent's biological children can qualify as the parent's "legitimated" children; that is, the statute's plain terms answer the question of *whom* parents may legitimate. *See Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019) (observing that "dictionary definitions" and "case law" can "shed light on [a] statute's ordinary meaning"); *Sims v. W. Steel Co.*, 551 F.2d 811, 820 (10th Cir. 1977) (gleaning a term's "plain meaning" from "dictionary definitions and case law"). Then, the Act turns to state law for the applicable process to determine which of those biological children have been in fact legitimated— *viz.*, to answer the question of *how* legitimation is effected among those children eligible to be legitimated. *See Pfeifer*, 41 F.2d at 466 (observing that the "[s]tatutes of the several states . . . are not uniform on the subject [of the acts a parent must perform to legitimate his biological child]"). Yet, in doing so, the Act does not abandon the plain meaning of *who* can be legitimated.

20

In sum, we hold that the BIA correctly interpreted the term "legitimated" in § 101(b)(1)(C) of the Act (i.e., 8 U.S.C. § 1101(b)(1)(C)) as plainly and unambiguously requiring that a legitimated child must be the legitimating parent's biological child. As such, our conclusion regarding the proper interpretation of the Act does not turn on the application of *Chevron* deference. *See, e.g.*, *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1979 (2016) (holding that even if an agency interpretation "could be owed *Chevron* deference, we do not defer to the agency when the statute is unambiguous").

**B**

Mr. Schreiber agrees that § 101(b)(1)(C) of the Act is unambiguous, but he contends that it means the exact opposite of what we have said. He asserts that the Act defers to state law in determining not only *how* a child is legitimated (i.e., the process by which an eligible child is legitimated), but also concerning *whom* a parent can legitimate (i.e., the category of children a parent may legitimate). *See* Aplt.'s Opening Br. at 17–18. He relies on three main cases to support his position that Congress left it to the states to determine for themselves the latter issue, *viz.*, the category of children a parent may legitimate. *See id.* at 17–20. He also contends that deferring to state-law understandings of legitimation that permit a parent to legitimate *any* child promotes Congress's intent of "keeping families together." *See id.* at 23–25. He further contends that the Act does not

21

indicate that a parent may legitimate only his biological children because § 101(b)(1)(C) speaks in terms of fathers and legitimating parents, whereas subsections (D) and (E) of § 101(b)(1) speak in terms of natural fathers and natural parents, thereby showing, he asserts, that a legitimating parent need not be a natural parent. *See id.* at 27–29. We discuss each of his arguments in turn, explaining why we believe that they are all unavailing.

**1**

Mr. Schreiber directs our attention to three cases which, he asserts, support the proposition that the Act defers to state law when determining whether a parent may legitimate a child who is not his biological offspring. He directs us first to *Matter of Cross*, 26 I. & N. Dec. 485 (BIA 2015), where the BIA held "that a person born abroad to unmarried parents can qualify as a legitimated 'child' under section 101(c)(1) of the Act if he or she was born in a country or State that has eliminated all legal distinctions between children based on the marital status of their parents . . . , irrespective of whether the country or State has prescribed other legal means of legitimation." *Id.* at 485–86. More specifically, the BIA determined in *Cross* that a child born in Jamaica to unwed parents was legitimated "by operation of law" because he was born after Jamaica "had eliminated the legal distinctions between legitimate and illegitimate children in

22

that country," i.e., "between children born in wedlock and those born out of wedlock." 26 I. & N. Dec. at 486, 488, 490.

Mr. Schreiber directs us to *Cross* because the BIA declared in a footnote that "[b]y tying the meaning of 'legitimation' to the requirements of the law of the child's residence or domicile (or that of the father), Congress anticipated that the meaning of the term would vary depending upon . . . the law in the country or State of residence or domicile," indicating that legitimation is "an evolving, rather than a fixed, concept." Aplt.'s Opening Br. at 17 (ellipsis in original) (emphasis omitted) (quoting *Cross*, 26 I. & N. Dec. at 492 n.8). Mr. Schreiber asserts that the *Cross* footnote "rightly . . . embrace[s]" the notion that, if a state also has expanded its conception of legitimation to permit parents to legitimate their non-biological children, those children may qualify as "legitimated" children for purposes of the Act. *Id.* at 17–18. We disagree. Nothing in *Cross* suggests that Congress intended the Act to adopt state-law ideas about *whom* a parent may legitimate. Indeed, the BIA did not even have occasion to question that a parent can legitimate only his biological children because, in that case, there was "no dispute that the respondent is the biological child of the man through whom he seeks to derive United States citizenship or that he was born in Jamaica." *Cross*, 26 I. & N. Dec. at 493; *see id.* at 490 (observing that "[a]lthough Jamaica . . . enacted laws that effectively eliminated the legal distinction between children

23

born in wedlock and those born out of wedlock, [it] retained a formal means of legitimating—the marriage of the biological parents"). Instead, we believe that *Cross* suggests only that a state may redefine *how* a child is legitimated under its laws (by, for example, automatically legitimating a child born out of wedlock by operation of law)—as opposed to *whom* a parent may legitimate. *See id.* at 488, 492.

Mr. Schreiber also directs our attention to the Supreme Court's decision in *De Sylva v. Ballentine*, 351 U.S. 570 (1956), where the Court turned to state law to determine whether "an illegitimate child is included within the term 'children' as used in [the copyright-renewal provision of the then-existing federal Copyright Act]." *Id.* at 580; *see also id.* at 571 (noting that the renewal provision provided that "the widow, widower, or children of the author, if the author be not living, . . . shall be entitled to a renewal and extension of the copyright in [the author's] work" under certain circumstances (quoting 17 U.S.C. § 24 (1955))). The Court observed that, although the author's illegitimate child was his child in terms of "a purely physical relationship," the Copyright Act's renewal provision used "[t]he word 'children' . . . [to] also describe[] a legal status." *Id.* at 580. And because "there is no federal law of domestic relations," the Court answered the question of whether an author's illegitimate child qualified as one of his "children" under the renewal provision by "refer[ring] to the law of the State which created those legal

24

relationships." *Id.* The Court, however, declared that it would not defer to state law in defining the term "children," as used in the federal statute, if the state has redefined the term beyond its "ordinary concept." *Id.* at 581; *see also id.* (stating that although the Court was "draw[ing] on the ready-made body of state law to define the word 'children' in [the Copyright Act]," that "does not mean that a State would be entitled to use the word 'children' in a way entirely strange to those familiar with its ordinary usage"). The Court then held that the author's illegitimate child qualified as one of his "children" for purposes of the Copyright Act's renewal provision, which provided "a compulsory bequest of the [author's] copyright to [his children]," because that child qualified as "an heir of the author" under the law of the relevant state. *Id.* at 582.

Mr. Schreiber argues that *De Sylva* requires us to deem Hyebin, who is not his biological offspring, "legitimated" for purposes of 8 U.S.C. § 1101(b)(1)(C) because he legitimated her under Kansas law by adopting her. Although he acknowledges that *De Sylva* would counsel against our deferring to Kansas law if its understanding of who can become his legitimated child deviates from "the ordinary concept," Aplt.'s Opening Br. at 18 (quoting *De Sylva*, 351 U.S. at 581), he does not give us a single word in support of why Kansas's conception of legitimation—which, he maintains, authorizes parents to legitimate their non-biological children in addition to, as is traditionally the case, their biological

25

children—falls within ordinary conceptual bounds, thus waiving such a critical argument, *Arlin Geophysical Co. v. United States*, 946 F.3d 1234, 1238 n.4 (10th Cir. 2020) ("Because [the appellant] failed to raise this argument in his opening brief, it is waived."). Mr. Schreiber, in the end, cannot prevail under *De Sylva* because he fails to show that we should defer under that case to Kansas's alleged position that a parent may legitimate children who are not the parent's biological offspring.

Mr. Schreiber, in any event, fails to prove that he legitimated Hyebin under Kansas law by adopting her. Under the argument heading "Kansas law recognizes Hyebin as Lt. Col. Schreiber's legitimated daughter," he dedicates only one short paragraph of his opening brief to this issue. Aplt.'s Opening Br. at 25 (bolding omitted). He contends that "adoption effectuates legitimation" under Kansas law because Kan. Stat. § 59-2118(b) results in "an adopted child [being] treated as though she had been born in wedlock to two married parents." *Id.* But that is not correct: § 59-2118(b) does not assume that all adopted children were born outside of wedlock. *See, e.g.*, *In re J.M.D.*, 260 P.3d 1196, 1198 (Kan. 2011) (affirming the adoption by their step-father of two children born in wedlock to their birth parents). The statute instead provides that an adopted child "shall be entitled to the same personal and property rights as a birth child of the adoptive parent," and

such adopted parent "shall be entitled to exercise all the rights of a birth parent and be subject to all the liabilities of that relationship." Kan. Stat. § 59-2118(b).

The statute thereby places an adopted child on the same plane in terms of personal and property rights as the adoptive parent's natural child, but it says nothing about treating the adopted child as if she were the product of the adoptive parent's marital union. To be sure, if both partners in a marriage were to adopt a child (or if one of them were already the child's legal parent), her adoption at least arguably would result in her being treated under Kansas law "as though she had been born in wedlock to [those] married parents." *See* Aplt.'s Opening Br. at 25. But that is different from saying that her adoption necessarily would make her the *legitimated* (as opposed to legal) child of her adoptive parent(s). That is especially true where, as here, the adopted child was not the illegitimate natural child of her adoptive parents. Indeed, like the one at issue in *Pfeifer*, the Kansas statute at issue here does not reveal on its face "a legislative intention to change the status of [an adopted] child from illegitimate to legitimate," and because Mr. Schreiber does not point us to any authority that interprets it as "a legitimation statute," we see no reason to construe it to be such. *See Pfeifer*, 41 F.2d at 467–68 (similarly declining to view a Kansas statute that granted rights of inheritance to a child as providing for the child's legitimation).

Mr. Schreiber also says that, in *Aslin v. Seamon*, 587 P.2d 875 (Kan. 1978), the Kansas Supreme Court "recognized" that adopted children are also legitimated children when the court said that "[s]everal different methods of legitimation" existed in Kansas at that time, including "adoption." Aplt.'s Opening Br. at 25 (alteration in original) (quoting *Aslin*, 587 P.2d at 877). But we are not persuaded by Mr. Schreiber's reliance on *Aslin* to support his contention that his adoption of Hyebin effected his legitimation of her under Kansas law. First of all, the Kansas statute that the Kansas Supreme Court considered in *Aslin* to guide its analysis has not been in effect for approximately thirty years. *See Aslin*, 587 P.2d at 877 (citing Kan. Stat. § 59-2103 (1978) (repealed 1990))). Furthermore, Mr. Schreiber does not explain why we should interpret *Aslin*'s bare statement as establishing that all adoptions under Kansas law are legitimations, including (novelly) a parent's adoption of a child who is not his biological child. Indeed, even if *Aslin*'s language could be read as addressing such a novel circumstance, it would likely be only dictum because *Aslin* involved the traditional question of whether a father had legitimated his *biological* children. *See* 587 P.2d at 877. Therefore, Mr. Schreiber's reliance on *Aslin* does not persuasively advance his cause.

Mr. Schreiber calls our attention last to the Fourth Circuit's decision in *Ojo v. Lynch*, 813 F.3d 533 (2016), where the court held that a child adopted at the

28

age of seventeen should be considered adopted at the age of fifteen for purposes of the Act because, thirteen years and nine months after his adoption, his adoptive father secured "a nunc pro tunc order from the . . . state court specifying that [his] adoption became effective before [the child] turned sixteen." *Id.* at 536. The court explained that because "state courts exercise full authority over the judicial act of adoption," "a child is 'adopted' for purposes of § 1101(b)(1)(E)(i) on the date that a state court rules the adoption effective, without regard to the date on which the act of adoption occurred." *Id.* at 539–40.

Putting aside any questions concerning the wisdom of *Ojo*'s holding,[4] we believe that the case stands at most for the proposition that the Act defers to state law in determining *when* a child is "adopted" for purposes of 8 U.S.C. § 1101(b)(1)(E)(i). *See* 813 F.3d at 541. The issue here, however, is different. We are not concerned with whether the Act similarly defers to state law in deciding *when* a child was "legitimated" for purposes of § 1101(b)(1)(C)—*viz.*, the *timing* of the act of legitimation. Rather, we are concerned with the

---

[4]     *See Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, ---- U.S. ---, 140 S. Ct. 696, 701 (2020) (per curiam) (explaining that a nunc pro tunc order "presupposes a decree allowed, or ordered, but not entered, through inadvertence of the court," and that such orders "are not some Orwellian vehicle for revisionist history—creating 'facts' that never occurred in fact" (first quoting *Cuebas y Arredondo v. Cuebas y Arredondo*, 223 U.S. 376, 390 (1912); then quoting *United States v. Gillespie*, 666 F. Supp. 1137, 1139 (N.D. Ill. 1987))); *id.* ("Put plainly, [a] court 'cannot make the record what it is not.'" (quoting *Missouri v. Jenkins*, 495 U.S. 33, 49 (1990))).

29

conceptual meaning of legitimation itself. More specifically, our focus is on whether the Act employs the ordinary meaning of the term *legitimation* or instead leaves it to the states to redefine the term's meaning in novel ways, i.e., ways that do not accord with its ordinary meaning. Because *Ojo* did not involve a state law that had redefined the very concept of adoption itself, it does not meaningfully inform our inquiry. More specifically, the decision does not support Mr. Schreiber's position that the Act requires the federal government to accept *as a legitimation* what Mr. Schreiber contends is Kansas's view of conduct that falls within that term's ambit—specifically, a parent's adoption of a non-biologically-related child.

## 2

Mr. Schreiber contends next that we should interpret the Act as deferring to state laws that permit parents to legitimate *any* child—and not just their biological children—because doing so furthers the congressional intent "of keeping families together." Aplt.'s Opening Br. at 23 (quoting *Cantwell v. Holder*, 995 F. Supp. 2d 316, 321 (S.D.N.Y. 2014)); *see id.* at 25 ("An interpretation of § 1101(b)(1)(C) that looks to state law to determine who is 'legitimated' and that incorporates states' efforts to keep pace with changing societal norms [by expanding whom a parent may legitimate] aligns with Congress's efforts to keep families together."); *id.* at 32 (asserting that any construction of the term "legitimated" that "conflicts

30

with Congress's aim of maintaining and fostering unity of immigrant families" is "unreasonable").

The great difficulty with Mr. Schreiber's interpretative position, however, is that—as the government correctly observes—there is "no indication" in the Act that Congress wanted to pursue the unity of families "at all costs." Aplee.'s Resp. Br. at 28. The Supreme Court, indeed, has repeatedly recognized that Congress has intentionally denied the status of "child" under the Act to some non-citizen children "who share strong family ties" with their citizen parents. *Hector*, 479 U.S. at 89 (quoting *Fiallo v. Bell*, 430 U.S. 787, 798 (1977)). Because "Congress has been actively engaged in delineating how broad it wishes the definition of 'child' to be," "we are especially bound to pay heed to the plain mandate of the words Congress has chosen." *Id.* at 90 n.6. And, as explained *supra*, we hold that it is implicit in the very concept of legitimation that a parent may legitimate only his biological children.

Although a parent may make a child who is not his biological offspring his lawful child with full filial rights, the process of doing so cannot properly be called "legitimation." *See, e.g.*, *Blythe*, 31 P. at 916 ("Adoption, properly considered, refers to persons who are strangers in blood; legitimation, to persons where the blood relation exists."); *Adoption*, BLACK'S ("Adoption is distinguishable from legitimation . . . . Adoption usu[ally] refers to an act

31

between persons unrelated by blood; legitimation refers to an act between persons related by blood."); *cf. De Sylva*, 351 U.S. at 580–81 (observing that although federal law turns to state law to define who are an author's "children" for copyright purposes, "[t]his does not mean that a State would be entitled to use the word 'children' in a way entirely strange to those familiar with its ordinary usage" because state law will control only "to the extent [that the state law uses] permissible variations in the ordinary concept of 'children'").

Accordingly, we conclude that any "congressional intent" to keep families together is "not a license to ignore the plain meaning of [this] specific statutory provision." *United States v. Lorenzetti*, 467 U.S. 167, 178 (1984); *accord United States v. Husted*, 545 F.3d 1240, 1245 (10th Cir. 2008) (stating that we will not read "the broad purposes" of a statute "to contradict [its] plain meaning").

**3**

Mr. Schreiber finally contends that the Act's language demonstrates that a legitimating parent need not be the child's biological parent because 8 U.S.C. § 1101(b)(1)(C) speaks in terms of fathers and legitimating parents, whereas nearby subsections speak instead about natural fathers and natural parents. *See* 8 U.S.C. § 1101(b)(1)(D)–(E). He points out in particular that § 1101(b)(1)(D) says that "a child born out of wedlock" can qualify as a "child" for purposes of the Act based on his "relationship" with his "natural mother" or his "bona fide parent-

32

child relationship" with his "natural father." *Id.* § 1101(b)(1)(D). He also notes

that § 1101(b)(1)(E) provides that if an adopted child qualifies as a "child" under

the Act, the child's "natural parent" shall not receive "any right, privilege, or

status under [the Act]," and the child's "natural sibling" may also qualify as a

"child" under the Act. *Id.* § 1101(b)(1)(E). He concludes that because Congress

specified "a biological connection" in subsections (D) and (E) by employing the

adjective "natural," but did not include the word "natural" in subsection (C), it is

"quite clear" that Congress did not intend that only a child's natural parent may

be his legitimating parent. *See* Aplt.'s Opening Br. at 28–29. We disagree.

Congress needed to specify in subsection (D) that the mother and the father

at issue were the "natural" parents of the "child born out of wedlock" because the

child could, of course, have a "relationship" with an adoptive mother and a "bona

fide parent-child relationship" with an adoptive father who lack any biological

connection with her. Congress similarly needed to specify in subsection (E) that

it was referring to the "natural parent" and the "natural sibling" of the "adopted"

child to ensure that no one confused them with the child's adoptive parents and

siblings through adoption. Congress, in contrast, did not need to specify in

subsection (C) that only a child's "natural" parent may be his "legitimating"

parent because, as explained, that biological connection is already implicit in the

concept of legitimation. *See Pfeifer*, 41 F.2d at 466 (stating that the "civil and

social status" of a legitimated child "becomes that of a lawful child of the *natural father*" (emphasis added)). We thus discern no reason to conclude from the absence of the adjective "natural" in subsection (C) that a "legitimating" parent need not be the natural (i.e., biological) parent of the "legitimated" child. The absence of that adjective is fully explained by the fact that including it would have been redundant.

* * *

In sum, we reject Mr. Schreiber's arguments that the Act is best construed as deferring to state law in determining *whom* a parent may legitimate.[5] We affirm the BIA's construction of the Act's term "legitimated" because its plain meaning requires the legitimated child to be the biological offspring of the legitimating parent.[6]

---

[5]  Mr. Schreiber also argues in support of his position that a number of federal statutes turn to state law to determine the scope of the rights they provide. *See* Aplt.'s Opening Br. at 20–23. We need not specifically address those arguments, however, because they are irrelevant, given our stated rationale that the Act's text is unambiguous in its use of the term "legitimated," and it necessarily follows from this fact that the Act does not contemplate deferring to state law regarding the question of *whom* a parent may legitimate.

[6]

The Adoptee Rights Campaign, appearing before us as *amicus curiae*, contends that we should hold that Hyebin is Mr. Schreiber's legitimated child for purposes of the Act because they have a bona fide parent-child relationship, and she has the same filial rights as his biological children would. But the Campaign, like Mr. Schreiber, fails to establish that a normal speaker of the English language

(continued...)

# III

Mr. Schreiber also contests the district court's refusal to entertain his late-blooming constitutional challenge to the BIA's interpretation of the statutory term "legitimated." The district court refused to hear the challenge because he had failed to raise it before the BIA. Mr. Schreiber maintains that the district court erred because he in fact had raised the challenge before the BIA, and, in any event, under the Supreme Court's decision in *Darby v. Cisneros* (referenced *supra*), he did not need to exhaust the challenge before the BIA because his

---

[6](...continued)

who knows the meaning of the term "legitimated" would say that an adopted child with full filial rights is thereby the adoptive parent's legitimated child. In a similar vein, the Children and Family Law Center of the Washburn University School of Law, appearing before us as *amicus curiae*, maintains that adoption is a means of legitimation in Kansas because the concepts of paternity and parentage have replaced the concept of legitimacy there. To be sure, whereas "[u]nder the common law an illegitimate child was held to be filius nullius," *Pfeifer*, 41 F.2d at 465, Kansas law today imposes on a child's "biological" parents, "regardless of the[ir] marital status," a "'parent and child relationship' . . . incident to which the law confers or imposes rights, privileges, duties and obligations." Kan. Stat. §§ 23-2205, 23-2206. It, thus, appears that Kansas may have eliminated the legal concept of illegitimacy from its family law. But whether Kansas has eliminated the concept of illegitimacy from its law is distinct from—and perhaps irrelevant to—the separate issue of whether Kansas legally considers every child adopted under its law as the legitimated, as opposed to the legal, child of the adoptive parent. The Center, like Mr. Schreiber, fails to produce any law establishing that Kansas views its adopted children as the adoptive parents' *legitimated* children. And, in light of our holding, we have no occasion to definitively opine on the matter.

35

appeal from the USCIS's decision to the BIA was optional. We disagree on both counts and uphold the district court's order.

**A**

We consider first whether the district court erred in determining that Mr. Schreiber "did not present his current [constitutional] arguments to the agency." Aplt.'s App. at 31. It is undisputed that Mr. Schreiber did not present them to the USCIS. *See* Aplt.'s Opening Br. at 40 (conceding that Mr. Schreiber "did not advance his constitutional claim in front of USCIS"). And the only constitutional challenge he raised before the BIA was that, if his alleged Kansas legitimation of Hyebin did not qualify as a legitimation under the Act, he would be deprived of "an essential part of the Liberty protected by the Fifth Amendment" (i.e., presumably, the Fifth Amendment's Due Process Clause), and *Hyebin* would be denied equal protection. Aplt.'s App. at 92 (quoting *United States v. Windsor*, 570 U.S. 744, 768 (2013)). He did not argue that he, himself, would be denied equal protection, and he did not indicate that either he or Hyebin would be denied their Fifth Amendment rights on account of their respective genders.

Before the district court, however, Mr. Schreiber argued that the BIA's interpretation of the statutory term "legitimated" resulted in "disparate treatment based on gender" in violation of the equal-protection component of the Fifth Amendment's Due Process Clause. *Id.* at 251. He maintained in particular that

36

the BIA's interpretation had this effect because it did not recognize that he could legitimate his non-biological daughter, whereas immigration authorities had said—through a written policy—that gestational mothers may legitimate their non-genetically-related children, to whom they gave birth after using assisted reproductive technology. *Id.* at 251–52. This was the first time he had articulated a gender-discrimination argument and suggested that *his own* equal-protection rights were at stake. Like the district court, we conclude that Mr. Schreiber did not exhaust this particular challenge before the BIA, and the district court thus properly declined to consider it. *See, e.g.*, *Garcia-Carbajal v. Holder*, 625 F.3d 1233, 1237 (10th Cir. 2010) (holding that to exhaust a claim before the BIA a petitioner "must present the *same specific legal theory* to the BIA before he or she may advance it in court").

However, Mr. Schreiber maintains that, if he did not present this constitutional challenge to the BIA, the Washburn Law Clinic—which appeared before the BIA as an *amicus curiae*—raised it. *See* Aplt.'s Opening Br. at 36–37. Mr. Schreiber cites no authority, however, even suggesting—much less establishing—that petitioners may properly claim to have exhausted arguments before the BIA that were in fact only presented to the agency by *amicus curiae* (i.e., another litigant). Yet, even assuming *arguendo* that this is so, the Washburn Law Clinic did not raise any gender-discrimination, equal-protection challenge to

37

the BIA's interpretation of the Act. The Clinic, instead, asserted that it would violate Mr. Schreiber's "right to equal protection" if, "when Kansas treats parents who derive paternity by adoption and those who derive paternity by biology the same, the federal government [were to] distinguish between the two in such a way that merely perpetuates the odious regime of discrimination against 'illegitimate' children." Aplt.'s App. at 145. The district court recognized that this equal-protection argument did not allege gender discrimination, but rather discrimination against "parentage established by adoption." *Id.* at 11 n.4. Mr. Schreiber quotes from the district court's recitation of the Clinic's argument to the BIA without contending that the district court misinterpreted it. *See* Aplt.'s Opening Br. at 36. We, therefore, conclude that the Clinic did not raise a gender-discrimination, equal-protection argument before the BIA. Therefore, even if the Clinic could exhaust such an argument for the benefit of Mr. Schreiber, it did not do so.

In sum, we have determined that neither Mr. Schreiber, nor the Washburn Law Clinic as *amicus curiae*, presented to the BIA a gender-discrimination, equal-protection challenge to the BIA's interpretation of the Act.

**B**

Mr. Schreiber maintains nonetheless that he did not have to exhaust this particular constitutional, equal-protection challenge to the BIA's interpretation of the Act. He argues first that presenting the challenge would have been "futile" because the BIA held "that it lacked jurisdiction to consider the constitutional claims [that were] raised." Aplt.'s Opening Br. at 39. He contends next that under *Darby v. Cisneros*, he did not have to present the challenge to the BIA because his appeal to the BIA from the USCIS's decision was optional. We reject both arguments and uphold the district court's refusal to consider his unexhausted challenge.

**1**

Mr. Schreiber argues first that he did not have to exhaust his constitutional, equal-protection challenge because the BIA's response to the constitutional challenges that were raised showed that any attempt to exhaust this one would have been futile. To be sure, the BIA ruled in this case that "[t]o the extent that constitutional arguments have been raised, the Board does not have jurisdiction to rule on the constitutionality of laws it administers." Aplt's App. at 129 (citing *Matter of Fuentes-Campos*, 21 I. & N. Dec. at 912). But we do not construe this language as indicating that the BIA was categorically precluded from considering

39

constitutional challenges that implicate *its interpretation* of the Act. *See*

*Theodoropoulos v. INS*, 358 F.3d 162, 172 (2d Cir. 2002) (citing *Adelphia*

*Commc'ns Corp. v. FCC*, for the proposition that, "[a]lthough a constitutional

attack upon a statute need not be raised before [an] agency, a constitutional attack

upon an agency's interpretation of a statute is subject to the exhaustion

requirement," 88 F.3d 1250, 1256 (D.C. Cir. 1996) (second alteration in

original)); *see also* Alina Das, *Administrative Constitutionalism in Immigration*

*Law*, 98 B.U. L. Rᴇᴠ. 485, 512, 514 (2018) (noting that one "area in which the

BIA has recognized its ability to apply constitutional principles to substantive

immigration law is the BIA's own interpretations" and that this "suggests" that

there may be space for assessment of the merits of such principles "in the realm

of ambiguous statutory interpretation"); *cf. In re Silva*, 16 I. & N. Dec. 26, 31 &

n.3 (1976) (Appleman, concurring) (noting an instance where the BIA's statutory

interpretation "had attempted to alleviate the lack of equal treatment evident in

the statute" but, in that instance, it "could go no further without flouting the

statute" and, because "it has no power to declare legislation unconstitutional,"

therefore "[n]o further 'interpretation' was possible"). And it is the BIA's

interpretation of § 1101(b)(1)(C) that is at issue here—not the constitutionality of

the statute itself.

Yet, Mr. Schreiber failed to present to the BIA his gender-discrimination reasons for reconsidering its interpretation of the Act. We, therefore, do not know whether—when presented with such an argument—the BIA would have reconsidered its precedent in *Bueno*, which set forth the BIA's interpretation of the Act's term "legitimated." *See Grullon v. Mukasey*, 509 F.3d 107, 113 (2d Cir. 2007) (noting that the non-citizen's "futility argument fails because he cannot demonstrate that the BIA was unable to provide the relief that he sought," in that the agency "could have reconsidered" en banc its adverse precedent "or it could have certified the question to the Attorney General"); *cf.* Aplt.'s App. at 129 (the BIA stating in the instant case that it was "not persuaded" that the "amicus curiae's arguments regarding Kansas law" were sufficient to "overcome the controlling precedent of *Matter of Bueno*").

Accordingly, Mr. Schreiber has not shown that it would have been futile to exhaust his current constitutional challenge before the BIA. *See Harline v. DEA*, 148 F.3d 1199, 1203 (10th Cir. 1998) (holding that a plaintiff challenging an administrative action "bears the burden of establishing" that "exhaustion would be futile").

**2**

Mr. Schreiber also asserts that, under *Darby v. Cisneros*, he did not have to present his constitutional challenge to the BIA because his appeal from the

41

USCIS's decision to the BIA was optional. *See* Aplt.'s Opening Br. at 39–42. In

*Darby*, the Supreme Court considered whether a federal court could decline to

review final agency action on the ground that the plaintiff ostensibly had failed to

exhaust his administrative remedies by failing to take an optional administrative

appeal of the otherwise final action before seeking judicial review.

The Supreme Court there construed § 10(c) of the APA—which is the

section defining when an agency action becomes reviewable under the APA—as

providing that "[w]hen an aggrieved party has exhausted all administrative

remedies expressly prescribed by statute or agency rule, the agency action is 'final

for the purposes of this section' and therefore 'subject to judicial review.'"

*Darby*, 509 U.S. at 146 (quoting 5 U.S.C. § 704).[7] The Court stated that, because

"[s]ection 10(c) explicitly requires exhaustion of all intra-agency appeals

mandated either by statute or by agency rule," it would be "inconsistent with the

plain language of § 10(c)" for courts to decline to review a final agency action on

the basis that the plaintiff had failed "to exhaust optional appeals as well." *Id*. at

147. The Court then concluded that, "where the APA applies, an appeal to

---

[7]   5 U.S.C. § 704 provides, in relevant part, that "final agency action"
is "subject to judicial review," and that, "[e]xcept as otherwise expressly required
by statute, agency action otherwise final is final for purposes of this section
whether or not there has been presented or determined an application . . . for any
form of reconsideration, or, unless the agency otherwise requires by rule and
provides that the action meanwhile is inoperative, for an appeal to superior
agency authority."

42

'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review . . . . Courts are not free to impose an exhaustion requirement as a rule of judicial administration where the agency action has already become 'final' under § 10(c)." *Id.* at 154 (quoting 5 U.S.C. § 704).

Mr. Schreiber asserts—and the government does not contest—that the law did not require him to appeal to the BIA from the USCIS's adverse determination on his I-130 petition before he properly could seek judicial review. Aplt.'s Opening Br. at 40 ("When USCIS denies a petition . . . , an appeal to the BIA is discretionary, taken, or not, at the opinion of the petitioner."); Aplee.'s Resp. Br. at 44 ("It is undisputed that no statute or regulation *required* Schreiber to appeal USCIS's denial of his Form I-130 to the BIA."). We, therefore, assume without deciding that the USCIS's rejection of Mr. Schreiber's petition on behalf of Hyebin constituted final agency action and that he did not have to appeal its ruling to the BIA. It does not necessarily follow from that premise, however, that Mr. Schreiber did not have to exhaust his gender-discrimination claim before the BIA, once he actually pursued an appeal there.

*Darby* only determined that a court may not decline to review final agency action under the APA on the ground that the plaintiff had the opportunity to pursue an optional, additional level of administrative review but did *not* do so.

43

509 U.S. at 146–47, 154. Recall that the Court based its holding on its interpretation of § 10(c) of the APA, *id.* at 146–47, which provides that "final agency action . . . [is] subject to judicial review" and that "agency action otherwise final is final for purposes of this section" once the aggrieved party has exhausted all administrative remedies "expressly required" by statute or rule, 5 U.S.C. § 704.

However, nothing in the APA's text—nor in *Darby*'s interpretation of it—indicates that a federal court may not require a party to have exhausted his administrative remedies (i.e., his arguments for relief) in an optional administrative appeal (here, to the BIA), *if* he actually elected to undertake such an appeal.[8] More specifically, as construed by *Darby*, § 10(c) of the APA

---

[8] This limitation on the reach of *Darby*'s holding is a natural and logical function of the factual circumstances that the Supreme Court faced there: the litigant there did not seek to avail himself of the optional administrative appeal. *See* 509 U.S. at 142. And we contend that it is mistaken and misguided to read *Darby* as speaking to the quite distinct situation, which is present here, where litigants actually have elected to pursue the optional agency appeal—thereby, requesting that the agency consider and opine on their request for relief. And seemingly the best authority that Mr. Schreiber and the Dissent can marshal for a contrary view is a thin reed indeed—the per curiam, unpublished decision of a Fifth Circuit panel in *AAA Bonding Agency, Inc. v. U.S. Department of Homeland Security*, 447 F. App'x. 603 (5th Cir. 2011) (per curiam) (unpublished). Putting aside the obvious fact that *AAA Bonding* is not even binding on the Fifth Circuit—let alone in our own circuit—its reasoning is unpersuasive because the panel does not even attempt to grapple with the distinction noted above, between litigants who completely forgo their optional appeal and litigants who pursue their optional appeal, thereby placing their

(continued...)

provides only that the district court could not decline to review the USCIS's otherwise final agency action because Mr. Schreiber did not exhaust an optional appeal to the BIA. *Darby*, 509 U.S. at 146–47, 154. But § 10(c) does not suggest—and *Darby* does not hold—that a district court may not require a petitioner, like Mr. Schreiber, to exhaust his claims before the BIA where, as here, "he decided to appeal to the BIA anyway, and *then* mount[ed] an APA challenge to the *BIA*'s decision in district court." Aplee.'s Resp. Br. at 44 (emphases added). In sum, neither the APA's text nor *Darby* precluded the district court from requiring Mr. Schreiber to exhaust his claims before the BIA—which, we assume, was an optional level of agency review in this case—once he elected to pursue a BIA appeal.

Stated otherwise, *Darby* would have barred the district court from declining to review the USCIS's (allegedly) final agency action on the ground that there was an optional, additional level of agency review in the BIA that Mr. Schreiber

---

[8](...continued)
request for relief before the agency. Rather, the *AAA Bonding* panel just perfunctorily decides that those two sets of litigants are, in effect, similarly situated and that *Darby* applies to both of them. *Cf. AAA Bonding*, 447 F. App'x at 612 (noting that the plaintiffs may present a defense in federal court that they allegedly did not adequately raise in the optional administrative appeal that they did pursue "just as they have raised the [same] defense [in federal court] . . . [where] the optional administrative appeals were *not* taken" (emphasis added)). In sum, given the perfunctory state of its analysis concerning *Darby*, *AAA Bonding* is unpersuasive, and we decline to cast our lot with it.

could have, but did not, take.  But that is not what the district court did here.  The district court, instead, declined Mr. Schreiber's invitation to overturn the BIA's new and distinct final agency action based on "the merits of arguments *not* presented to [it]."  *See* Aplt.'s App. at 32 (emphasis added) (citing *Garcia-Carbajal*, 625 F.3d at 1237).  As such, the district court was applying the "fundamental principle of administrative law that an agency must have the opportunity to rule on a challenger's arguments before the challenger may bring those arguments to court."  *Garcia-Carbajal*, 625 F.3d at 1237.  Because this is not a situation where the district court faulted a petitioner for failing to take an optional level of agency review, but rather for failing to exhaust his arguments before the final level of agency review that he in fact elected to pursue, *Darby* is distinguishable, and we discern nothing in that case nor in the APA's text that would indicate that the district court erred here.

As the D.C. Circuit correctly observed in *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076 (D.C. Cir. 2009), "*Darby* stands for the proposition that absent a statutory or regulatory requirement to the contrary, courts have no authority to require petitioners seeking judicial review of a final agency action to *further* exhaust administrative procedures."  *Id.* at 1079 (emphasis added).  The effect of the district court's decision here was not to require Mr. Schreiber "to *further* exhaust administrative procedures," *id.* (emphasis added); instead, it

46

simply held him accountable for not having exhausted his claims in the administrative proceeding that he freely availed himself of—the BIA proceeding that resulted in the adverse ruling that he now challenges in court. And in doing so, the district court adhered to the fundamental principle of administrative law that instructs courts not to "usurp[] the agency's function [by] set[ting] aside the administrative determination upon a ground not theretofore presented and depriv[ing] the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Garcia-Carbajal*, 625 F.3d at 1237 (final alteration in original) (quoting *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)).

Lastly, Mr. Schreiber contends that the district court should not have required him to exhaust his constitutional challenge before the BIA because doing so will "discourage discretionary appeals" by creating "[an] incentive for the subject of [an] adverse [administrative] decision to skip the discretionary appeals process entirely to secure more time to consider possible claims" to present to the district court. Aplt.'s Reply Br. at 23. We are unpersuaded that this practical consideration is sufficiently weighty to overcome, as a matter of law, the "fundamental principle . . . that an agency must have the opportunity to rule on a challenger's arguments before the challenger may bring those arguments to court." *Garcia-Carbajal*, 625 F.3d at 1237. We believe that, despite this

47

principle of exhaustion, petitioners will continue to pursue optional administrative appeals in order to receive the benefit "of whatever expertise the agency may possess." *Id.*

\* \* \*

In sum, we hold that the district court violated neither the letter nor the spirit of the Supreme Court's holding in *Darby* by requiring Mr. Schreiber to exhaust before the BIA his constitutional, gender-discrimination challenge to the BIA's interpretation of the Act.

**IV**

In conclusion, we agree with the district court's determination that the BIA properly ruled that Hyebin cannot qualify as Mr. Schreiber's "legitimated" child for purposes of 8 U.S.C. § 1101(b)(1)(C) because she is not his biological child. We hold that, under the plain meaning of the word "legitimated," as employed in the Act, a parent may legitimate only his biological offspring. We also hold that the district court did not violate the Supreme Court's holding in *Darby v. Cisneros*, when it refused to entertain Mr. Schreiber's gender-discrimination challenge to the BIA's interpretation of the Act because he had failed to exhaust this challenge in his optional appeal to the BIA from the ruling of USCIS. In sum, for the foregoing reasons, we **AFFIRM** the district court's judgment.

18-3215, *Schreiber v. Cuccinelli*
**TYMKOVICH**, C.J., concurring in the judgment.

I join Part III of Judge Holmes's opinion affirming the district court's refusal to

entertain Schreiber's constitutional challenge to the BIA's interpretation of the term

"legitimated" in 8 U.S.C. § 1101(b)(1)(C). But I disagree with Judge Holmes's

interpretation of that term in Part II—an interpretation that in the final analysis is

unnecessary in light of Schreiber's failure to establish that Kansas law considers a

father's adoption of a child to be a form of legitimation, regardless of whether the adopted

child is biologically related.

In construing the phrase "legitimated under the law . . . of the father's residence or

domicile," 8 U.S.C. § 1101(b)(1)(C), Judge Holmes notes "[t]he word 'legitimated' when

used to describe a 'child' has long meant something very specific in the law." Maj. Op. at

13. Relying upon our discussion in *Pfeifer v. Wright*, 41 F.2d 464 (10th Cir. 1930), Judge

Holmes explains that at common law, legitimation involved changing the legal status of a

child born out of wedlock to one invested with all the rights of a "lawful child of the

natural father," and "the child and father thereafter stand in their relations to each other as

though the birth had been during wedlock." Maj. Op. at 13–14 (quoting *Pfeifer*, 41 F.2d

at 466). Judge Holmes's opinion then conceptualizes the meaning of "legitimated" under

two axes—one that defines *who* can be legitimated (only biological children, pursuant to

the common law understanding of legitimation set forth in *Pfeifer*), and the other that

defines *how* a child is legitimated (a state law process). The statutory language of

§ 1101(b)(1)(C) does not support this approach to the word "legitimated," and, in any

case, Judge Holmes's analysis is unnecessarily broad in light of Schreiber's failure to establish the underlying premise of his argument—namely, that an adopted non-biological child is "legitimated" under Kansas law.

The opinion's focus on the meaning of the word "legitimated" in the statute does not adequately take into account that the word is modified by the phrase "under the law . . . of the father's residence or domicile." As the Board of Immigration Appeals noted in *Matter of Cross*:

> By tying the meaning of "legitimation" to the requirements of the law of the child's residence or domicile (or that of the father), Congress anticipated that the meaning of the term would vary depending upon (1) the law in the country or State of residence or domicile and (2) the child's date of birth. "Legitimation" is thus an evolving, rather than a fixed, concept.

26 I &N. Dec. 485, 492 n.8 (BIA 2015). Judge Holmes dismisses *Cross*, arguing that "[n]othing in *Cross* suggests that Congress intended the Act to adopt state-law ideas about *whom* a parent may legitimate." Maj. Op. at 23 (emphasis in original).

But the point here, and that the BIA made in *Cross*, is *the statute itself* indicates Congress's intent to adopt state-law definitions of legitimation. Section 1101(b)(1)(C) modifies the term "legitimated"—a term otherwise undefined in the statute—with the phrase, "under the law . . . of the father's residence or domicile." Judge Holmes's approach requires us to either sever the word "legitimated" from the modifying phrase that immediately follows, or to assume the modifying phrase applies only to the process of becoming legitimated and not to the meaning of the word "legitimated" itself. The

2

latter approach might have been defensible if Congress had elsewhere in the statute defined "legitimated" consistent with *Pfeifer*, but it did not do so. And even assuming *Cross* stands for the proposition that § 1101(b)(1)(C) may provide for legitimation of a non-biological child in those cases where the applicable state statute expands the definition of legitimation to include non-biological children, Schreiber still has a problem.

The problem is that this is not one of those cases. I agree with Judge Holmes that adoption under Kansas law does not, as Schreiber contends, effectuate a parent's legitimation of a non-biological child. *See* Maj. Op. 26–28. Therefore, the premise of Schreiber's argument—that Kansas law allows for the legitimation of a non-biological child—is incorrect. As Judge Holmes notes, the Kansas adoption statute at issue here, Kan. Stat. § 59-2118(b), does not provide textual support for a legislative intention to treat a child adopted under the statute as "legitimated." Schreiber has not pointed to any Kansas case that interprets § 59-2118 as a legitimation statute, nor have we found any. Schreiber does cite a Kansas Supreme Court case, *Aslin v. Seamon*, 587 P.2d 875 (Kan. 1978), where the court said there are several different methods of legitimation, including adoption, *id.* at 877. But *Aslin* involved whether a father had legitimated his biological children, under a Kansas statute that was repealed 30 years ago. I agree with Judge Holmes that *Aslin* is, at best, dicta. Without any explicit indication that all Kansas adoptions are also legitimations, this is not a case of a child being "legitimated under the law . . . of the father's residence or domicile" within the meaning of 8 U.S.C. § 1108((b)(1)(C).

Because the premise of Schreiber's argument is incorrect, Judge Holmes's analysis—which seems to preclude *any* adopted non-biological child from *ever* being considered legitimated under § 1101(b)(1)(C), regardless of the relevant state statute—is unnecessarily sweeping. I would leave open the possibility that in a future case, an adopted child not biologically related to the adopting parent could be considered "legitimated" under § 1101(b)(1)(C) if the relevant state statute so provided.[1] I therefore concur in Section II of Judge Holmes's opinion only as to the result.

---

[1] Of course, as Judge Holmes notes, even where a federal statute defers to state law definitions, the Supreme Court cautions that a state is not entitled to use a word "in a way entirely strange to those familiar with its ordinary usage." *De Sylva v. Ballentine*, 351 U.S. 570, 581 (1956). I would reserve for another day the question of whether a state statute that expressly equates "legitimated" with the adoption of a non-biological child would violate that principle.

18-3215, *Schreiber v. Cuccinelli*

**BALDOCK**, Circuit Judge, concurring in part and dissenting in part:

Today, the Court reaches two conclusions. First, the Court holds that the term "legitimated," as used in 8 U.S.C. § 1101(b)(1)(C), unambiguously requires a biological connection between the legitimating parent and legitimated child. In so holding, the Court reads into the statute a requirement that simply is not present. Nevertheless, because the term "legitimated" is reasonably susceptible to multiple interpretations, I would defer to the agency's interpretation of the statute under *Chevron*. I therefore write separately to concur in this part of the Court's judgment.

Second, the Court concludes that Mr. Schreiber waived his gender discrimination claim because he did not present the claim to the BIA in his *optional* interagency appeal. But the Supreme Court has advised us that we cannot require plaintiffs to exhaust *discretionary* administrative remedies. Because the Court's opinion has the effect of imposing additional exhaustion requirements not required by the relevant statute or agency rule, I dissent to this part of the Court's judgment.

A. *Meaning of Legitimated under 8 U.S.C. § 1101(b)(1)(C)*

I turn first to the Court's conclusion that 8 U.S.C. § 1101(b)(1)(C) unambiguously requires a "legitimated child" to have a biological relationship with his or her legitimating parent. When reviewing an agency's interpretation of a statute it administers, we apply the two-step review outlined by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resource Defense Council*, 467 U.S. 837 (1984). *See Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1187 (10th Cir. 2016). Under the

first step, we ask "whether the statute unambiguously addresses 'the precise question at issue.'" *New Mexico v. Dep't of Interior*, 854 F.3d 1207, 1221 (10th Cir. 2017) (quoting *Chevron*, 467 U.S. at 842). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43.

Therefore, under *Chevron*, the Court must first determine whether 8 U.S.C. § 1101(b)(1)(C) is ambiguous. Section 1101(b)(1)(C) defines a "child" of a United States citizen as:

> a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation

8 U.S.C. § 1101(b)(1)(C). In no fewer than twenty pages, the Court holds the term "legitimated" is unambiguous. The Court isolates the word "legitimated" from its context and relies on the purportedly "ordinary meaning" of the term to reach this conclusion. But if the ordinary meaning of "legitimated" was so clear, why would we need more than a few pages to explain how so?

The Court spends the better part of its opinion explaining how the word "legitimated" necessarily implies a biological connection. For example, the Court emphasizes the historical meaning of "legitimated" as defined by our caselaw. Pointing to *Pfeifer v. Wright*, the Court explains that a legitimated child is one that becomes the "lawful child of the *natural* father." 41 F.2d 464, 466 (10th Cir. 1930) (emphasis added). Similarly, the Court uses dictionary definitions of the term

2

"legitimation" (or derivatives thereof) to explain how legitimation requires a biological connection between the parent and child. While the Court fairly characterizes our caselaw and the relevant definitions of "legitimation," I remain unpersuaded that "legitimated" as used in § 1101(b)(1)(C) can only be understood one way. That is, the Court clearly explains how *one* reasonable interpretation of the term "legitimated" requires a biological relationship but fails to address why this is the *only* reasonable interpretation of the term. *See Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1226 (10th Cir. 2014) (explaining that a statute is ambiguous if it can reasonably be interpreted in more than one way).

Based largely on the statute's plain language and structure, the phrase "a child legitimated" under the law of the child's or father's domicile is ambiguous. *See Am. Fed'n of Gov't Emps., Local 1592 v. Fed. Labor Relations Auth.*, 836 F.3d 1291, 1295 (10th Cir. 2016) (explaining that we should look to a statute's text, structure, purpose, history, and relationship to other statutes to determine if the statute is ambiguous). To begin, the structure of the statute suggests that the word "legitimated" could be defined in more than one way, depending on state law. That is, § 1101(b)(1)(C) provides that a child must be legitimated "under" the law of the child's or father's residence. When "legitimated" is understood in the context of the statute—as opposed to read in isolation as the Court's opinion would have it—the section allows for multiple interpretations, as states are free to define the term as they see fit. While the Court suggests the phrase "under" state law only refers to *how* a child may be legitimated (as

3

opposed to *who* may be legitimated), nothing in the statute's plain language suggests such a construction.

Quite the opposite, in fact. Section 1101(b)(1)(C) contains no mention of *who* may be legitimated, and it certainly includes no explicit requirement that the legitimated child be biologically related to the legitimating parent. The Court dismisses Congress's failure to include a biological requirement by suggesting Congress "did not need to specify . . . that only a child's 'natural' parent may be his 'legitimating' parent because . . . that biological connection is already implicit in the concept of legitimation." The Court supports this contention by pointing to other sections of the original 1952 Act wherein, by the Court's argument, Congress clearly contemplated that legitimation implied a biological relationship. *See, e.g.*, 8 U.S.C. § 1409(a), (b) (2020); 8 U.S.C. § 1432(a)(3) (repealed 2000). But what the Court fails to recognize is that, in those other sections, Congress *expressly* required *both* legitimation *and* a biological relationship. *See id.*

For example, 8 U.S.C. § 1409(a) allows a child born out of wedlock to be naturalized if, among other things, "the [child] is legitimated under the law of the [child's] residence or domicile." 8 U.S.C. § 1409(a)(4)(A). To be legitimated is not enough, however. Section 1409(a) also requires proof of "a blood relationship between the [child] and the father." 8 U.S.C. § 1409(a)(1); *see also* 8 U.S.C. § 1409(b) (providing that the paternity of a child can be established by legitimation); 8 U.S.C. § 1432(a)(3) (repealed 2000) (stating the same). Interestingly, the Court argues these sections *support* its conclusion that legitimation *inherently* implies a biological

4

connection.  But if a biological connection was inherent or implied, it would not need to be explicitly stated.  And while the Court is correct—we generally assume identical words used in different parts of the same act have the same meaning—this presumption is overcome by evidence that Congress intended something different.  Here, where Congress plainly required proof of legitimation *and* a blood relationship to be naturalized under § 1409(a) but omitted the requirement of a biological connection to be a "child legitimated" under § 1101(b)(1)(C), we cannot assume Congress intended the same thing.  *See Maralex Res., Inc. v. Barnhardt*, 913 F.3d 1189, 1200 n.5 (10th Cir. 2019) (quoting *Pereira v. Sessions*, 138 S. Ct. 2105, 2115 (2018)).

Even if we look exclusively at 8 U.S.C. § 1101(b)(1), subsection (D) provides that the definition of a "child" under the Act also encompasses "a child born out of wedlock, by, through whom, or on whose behalf a status, privilege, or benefit is sought by virtue of the relationship of the child to its *natural mother* or to its *natural father* if the father has or had a bona fide parent-child relationship with the person."  8 U.S.C. § 1101(b)(1)(D) (emphasis added).  That Congress used the terms "natural mother" and "natural father" when it needed to in § 1101(b)(1)(D) but omitted the "natural mother" and "natural father" requirement from § 1101(b)(1)(C) is telling.  We should not read into a statute that which is absent—particularly where Congress included the very words we seek to add in an adjoining subsection.  *See Antonin Scalia & Bryan A. Garner*, READING THE LAW: THE INTERPRETATION OF LEGAL TEXTS 93 (2012) (explaining that courts should avoid adding "to what the text states or reasonably implies . . . . [t]hat is, a matter not covered is to be treated as not covered.").  Again,

5

the Court dismisses this argument with the notion that a biological connection is implicit in the concept of legitimation. But again, where Congress wanted to condition legitimation on a biological connection, it plainly did so. *See* 8 U.S.C. § 1409(a). Here, Congress omitted any mention of *who* can be legitimated, and we should not read any such requirement into the statute.

In sum, the plain language and structure of the statute, as well as the use of the term "legitimation" throughout the Act, supports the conclusion that a legitimated child in § 1101(b)(1)(C) need not have a biological connection to the legitimating parent. Though the Court presents several persuasive arguments that the term "legitimation" does imply such a requirement, *both* interpretations are reasonable. While I could delve further into the statute's purpose and legislative history, the result is the same. Because the statute is reasonably susceptible to more than one interpretation, it is ambiguous under *Chevron* step one. *See Nat'l Credit Union*, 764 F.3d at 1226.

Once we determine the statute is ambiguous, we must defer to the agency's interpretation if it is "reasonable." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). On this issue, I need not belabor the point—the agency's interpretation of "legitimated" is reasonable. As the Court's opinion carefully explains, the plain meaning of a "legitimated child" often infers a biological relationship between the parent and child. Therefore, while I would conclude that § 1101(b)(1)(C) is ambiguous, I would nonetheless defer to the agency's reasonable interpretation under *Chevron*. *See Chevron*, 467 U.S. at 843. And for this reason, I concur in the result.

6

## B. *Waiver of Gender Discrimination Claim*

Although I would uphold the agency's reasonable interpretation of the term "legitimated," I would nonetheless remand this case to the district court for consideration of Mr. Schreiber's constitutional challenge to the agency's determination. In so far as the Court holds Mr. Schreiber waived his equal protection claim by failing to present it in his optional interagency appeal, I dissent.

Typically, plaintiffs must exhaust their administrative remedies before bringing their grievances to federal court. *Forest Guardians v. U.S. Forest Serv.*, 641 F.3d 423, 430 (10th Cir. 2011). To satisfy the exhaustion requirement, plaintiffs must "'structure their participation so that it alerts the agency to the parties' position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Forest Guardians v. U.S. Forest Serv.*, 495 F.3d 1162, 1170 (10th Cir. 2007) (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004)). Claims not properly raised before the agency are waived. *Id.* Thus, "we often refuse to consider arguments—sometimes very good arguments—that were not presented to the agency before being presented to us." *Garcia-Carbajal v. Holder*, 625 F.3d 1233, 1237 (10th Cir. 2010).

Nevertheless, in *Darby v. Cisneros*, the Supreme Court held lower courts cannot require a plaintiff to exhaust administrative remedies before seeking judicial review under the APA unless the relevant statute or agency rule specifically mandates exhaustion as a prerequisite to judicial review. 509 U.S. 137, 154 (1993); *see also Farrell-Cooper Mining Co. v. U.S. Dep't of Interior*, 864 F.3d 1105, 1107 (10th Cir. 2017) (applying *Darby*). The Supreme Court cautioned lower courts that "impos[ing]

7

additional exhaustion requirements beyond those provided by Congress or the agency . . . would transform § 10(c) [of the APA] from a provision designed to 'remove obstacles to judicial review of agency action,' into a trap for unwary litigants." *Darby*, 509 U.S. at 146–47 (*citing Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988)).

In this case, the parties agree Mr. Schreiber was not *required* to appeal to the BIA. *See* 8 C.F.R. § 1003.1(b) (providing a person "may" appeal to the BIA). Therefore, the question becomes: If a plaintiff elects to pursue an optional administrative appeal but fails to raise certain claims, are those claims reviewable in the first instance at the district court? Extending *Darby*, at least one circuit court has held that they are.

In *AAA Bonding Agency Inc. v. United States Department of Homeland Security*, the Fifth Circuit reversed the district court's holding that the plaintiffs forfeited one of their claims by pursuing an optional administrative appeal without raising that claim. 447 F. App'x 603, 612 (5th Cir. 2011) (unpublished). The court explained that "when an agency's regulations require issue exhaustion in administrative appeals, an issue not presented to the administrative body cannot be asserted for the first time in federal court." *Id.* But, relying on *Darby*, the Fifth Circuit concluded "federal courts do not have the authority to require a plaintiff to exhaust administrative remedies before seeking judicial review under the APA, where neither the relevant statute nor agency rules specifically mandate exhaustion as a prerequisite to judicial review." *Id.* Because administrative review was optional, the Fifth Circuit held the district court erred in rejecting the plaintiffs' claims arguments as waived. *Id.*

8

Although the Fifth Circuit's opinion was unpublished, it makes good sense. Mr. Schreiber's decision to pursue an optional administrative appeal without raising his equal protection claim should not foreclose his ability to pursue the claim in the district court. To hold otherwise would "impose additional exhaustion requirements beyond those provided by Congress or the agency . . . [and] would transform § 10(c) from a provision designed to 'remove obstacles to judicial review of agency action,' into a trap for unwary litigants." *Darby*, 509 U.S. at 146–47 (*citing Bowen*, 487 U.S. at 904)).

Moreover, requiring plaintiffs who pursue optional interagency appeals to present *all* their claims or risk waiving judicial review would discourage discretionary appeals. Take, for example, the denial of a visa. In that situation, a plaintiff only has 63 days to file an appeal brief with the BIA. But if that person declined the optional interagency appeal, he would have six years to file the same appeal in federal court. *See Impact Energy Res., LLC v. Salazar*, 693 F.3d 1239, 1245 (10th Cir. 2012) ("APA claims are generally covered by the six-year limitations period contained in 28 U.S.C. § 2401(a)."). The additional time a person would have to craft his claims before presenting them in federal court (as opposed to in an interagency appeal) creates a strong incentive to skip the discretionary appeals process altogether. This consideration is significant and not an outcome we should espouse.

For these reasons, I would not require Mr. Schreiber or other plaintiffs who choose to pursue optional interagency appeals to exhaust all of their claims in that discretionary appeal. In so far as the Court concludes the opposite, I respectfully dissent.

9